**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**DAVID BEITLE and JULIE BEITLE,** :
**as parents and next friends of JOSHUA BEITLE:**
**Plaintiffs** :
: **C.A. No. C.A. 06-62**
**v.** :
:
**EAST GREENWICH SCHOOL COMMITTEE** :
**Defendant** :

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Now come the Plaintiffs, and hereby move for summary judgment on their claims in the above-referenced matter. In support of its Motion, the Plaintiffs rely upon their Memorandum in Support of Their Motion for Summary Judgment, attached hereto and made a part hereof.

David Beitle and Julie Beitle,
By their attorney,

[signature]

Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888

**CERTIFICATION**

I, the undersigned, hereby certify that on June 9, 2006 I sent a true copy of the within by Regular Mail to all of the parties below:

Raymond Marcaccio
Oliverio & Marcaccio
55 Dorrance Street, Suite 400
Providence, RI 02903

[signature]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID BEITLE and JULIE BEITLE, as parents and next friends of JOSHUA BEITLE :

C.A. No. 06-62

v.

EAST GREENWICH SCHOOL COMMITTEE :

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before this Honorable Court on appeal of the Special Education Due Process Hearing Officer's decision of January 13, 2006. The subject of that decision was the request for due process hearing filed by Dr. and Mrs. Beitle, parents of Joshua Beitle, a nine-year-old child. Up until academic year 2005-2006, Joshua attended the East Greenwich Public Schools (hereinafter, "District"). The year before, Joshua had been diagnosed with Asperger's Disorder and found eligible for special education. This finding came after many years of school difficulties that had caused Joshua to suffer from depression and anxiety.

Unfortunately, the District has yet to offer Joshua the free and appropriate public education (FAPE) to which he is entitled pursuant to the IDEA. Although Joshua finally received an IEP last year, it was not implemented appropriately. This aggravated his mental condition, to the extent that his ability to remain in school and learn was seriously compromised. The District similarly failed to offer Joshua a FAPE for 2005-2006 academic year. Simply put, the District's response was to offer an already emotional fragile child a more stressful environment with fewer supports than ever. Indeed, at hearing, even the District's own expert would note serious deficiencies with the District's planning. These deficiencies made the proffered IEP nothing more than a recipe for another year of failure.

In response to this continued denial of FAPE -- which was undermining Joshua's educational progress as well as his mental health -- Dr. and Mrs. Beitle unilaterally placed Joshua at the Wolf School in Providence, and sought a due process hearing in order to obtain reimbursement for tuition. The hearing officer rendered her decision on or about January 13, 2006, finding that the District had offered FAPE, and that therefore the District was not responsible for reimbursement of Joshua's tuition. Because the hearing officer's decision overlooked key evidence, and was infected by errors of law regarding the definition of FAPE, this decision should be overturned.

## II. LEGAL ARGUMENT

Jurisdiction over this matter resides in this Court pursuant to 20 U.S.C.A. 1415(i)(2), as well as the Rhode Island Board of Regents' Regulations for the Education of Disabled Children, ("SPED Regs") § 300.512. As is typical of reviews of hearing officer decisions, the Motion for Summary Judgment is a procedural device in which the parties seek to have the case decided on the basis of the administrative record. *See, e.g., Bristol Warren Regional Sch. Comm. v. Rhode Island Dept. of Educ.*, 253 F.Supp.2d 236, 240 (D.R.I. 2003). Unlike the process followed in a typical motion for summary judgment, this Court does not determine whether there is a material issue of fact, but instead reviews the decision of the hearing officer below. *See id.* The standard of review of the hearing officer decision is not that applied in an appellate court, which limits itself to determining whether the tribunal below committed a legal error. The role of the reviewing court in matters brought pursuant to 20 U.S.C.A. § 1415(i)(2) and SPED Regs § 300.512 is much broader. The reviewing court does determine whether the hearing officer committed legal errors, and determines such questions of law *de novo*. *See id.* However, unlike an appellate court, this Court has much broader authority to review the factual determinations of the hearing officer.

This Court's role in reviewing the factual determinations of the hearing officer has been described as one of "involved oversight." *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir. 1990). While some due deference must be given to the hearing officer's factual findings, the decision must ultimately be an independent one based upon the preponderance of evidence. *See id.* Furthermore, the precise degree of deference due such findings is ultimately left to the discretion of the trial court. *See G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 946 (1st Cir. 1991). In particular, a reviewing court is permitted to disregard said findings when they are unreliable or incorrect in light of the totality of the record. *See Milford Sch. Dist. v. William F.*, 129 F.3d 1252, 1997 WL 696108, *3 (1st Cir. 1997), *citing Abrahamson v. Hershmann*, 701 F.2d 223, 231 (1st Cir. 1983). The reviewing court is also permitted to determine how much weight a particular fact should receive. *See Milford* at *4. *See also Roland M.*, 910 F.2d at 990. Finally, the reviewing court need not give deference to a finding of fact that is affected by the hearing officer's error of law. *See Ross v. Framingham Sch. Comm.*, 44 F.Supp.2d 104, 112 (D. Mass. 1999), *aff'd* 229 F.3d 1133.

The Beitles seek reimbursement from the District for tuition for Joshua's attendance at the Wolf School. In order to obtain this reimbursement, the Beitles were required to establish that 1) the IEP proffered by the District was not reasonably calculated to offer Joshua a FAPE; and 2) the placement at the Wolf School was appropriate. *See Florence County v. Carter*, 510 U.S. 7, 11, 114 S.Ct. 361, 364, 126 L.Ed.2d 284 (1993). The hearing officer made a specific finding that the IEP offered for Joshua's fourth grade year was reasonably calculated to offer Joshua a FAPE, and that therefore the District was not liable for tuition reimbursement. As we will describe in detail below, this finding is incorrect in light of the totality of the record below. The hearing officer ignored crucial evidence that under the circumstances of this case, the proffered IEP would not have offered Joshua a FAPE. Her understanding of what information

was relevant was apparently affected by her erroneous understanding of the definition of FAPE, particularly in regards to its command that a student's emotional and social needs be addressed. Accordingly, her findings of fact should be accorded no deference by this court, and her decision overturned.

## A. <u>THE HEARING OFFICER ERRED WHEN FINDING THAT DISTRICT PROVIDED JOSHUA WITH A FAPE.</u>

The hearing officer appears to have based her conclusion that Joshua had received a FAPE almost entirely upon the fact that he has been promoted from grade to grade and received passing marks. (Decision, p. 21.) However, the U.S. Supreme Court in the landmark case of *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), explicitly rejected such a facile definition of FAPE. *Id.* at 203, n.25. Although promotion and passing marks can only be considered an indicia that a student is receiving FAPE; it is not dispositive of the question. *Id.* Although a school district is not required to maximize the student's potential, the proffered IEP must be "reasonably calculated" to provide educational benefit. *Id.* at 203-04. Furthermore, the educational benefit to be conferred must be "meaningful." *Id. at* 192. In keeping with the IDEA's demand that each disabled child be considered as an individual, the *Rowley* Court also emphasized that the "meaningfulness" of the educational benefit conferred should be determined by the potential of the individual child. *Id.* at 202.

A growing number of circuits have expanded on the *Rowley* Court's intimation that a meaningful benefit can only be determined on a case-by-case basis. As the Sixth Circuit recently noted, the drafters of the current IDEA clearly did not intend that the schools do the bare minimum for disabled children, or that a student's merely "getting by" would be enough to satisfy the FAPE requirement. Instead, the Sixth Circuit observed, the current IDEA contemplates that disabled children are not to be simply passed through the system, but be

permitted to reach their intellectual potential, and also be prepared for employment and independent living. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 864 (6th Cir. 2004), *citing T.R. ex rel. N.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 578 (3rd Cir. 2000) (Emphasis added). Under this standard, merely "getting by" from one grade to the next is simply not enough.

Also key to our discussion of FAPE is the breadth of services that must be offered in order to allow for a "meaningful" educational benefit. FAPE is not defined by academic achievement alone – whether in terms of passing from grade to grade or even excelling in one's studies. The drafters of the IDEA recognized that in order to benefit from any attempt to impart cognitive skills, the child's physical, emotional, or social skills may require development. *See, e.g., Gonzalez v. Puerto Rico Dept. of Educ.*, 254 F.3d 350, 352-53 (1st Cir. 2001); *Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir. 2001). "Education" under IDEA may include services necessary to improve the child's academic, physical, emotional, or social skills. *See also Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1089-90 (1st Cir. 1993); *Timothy W. v. Rochester, N.H. Sch. Dist.*, 875 F.2d 954, 970 (1st Cir. 1989); *Lamoine Sch. Comm. v. Ms. Z.*, 353 F.Supp.2d 18, 30 (D. Me. 2005). Therefore, an IEP has been described as a package that must target all of a child's special needs. *See Lenn* at 1089-90; *Roland M.*, 910 F.2d at 992; *Timothy W.* at 970. Included among these needs that must be addressed by an IEP are the opportunity to acquire the social skills, emotional well-being, and self-esteem that allow one to benefit from one's educational experience and eventually become self-sufficient. *See, e.g., Lawrence Township Bd. of Educ.*, 42 IDELR 241 (N.J. SEA, 2004.) The failure to provide those components in an IEP may justify a unilateral placement. *See Lawrence.*

It is therefore a denial of FAPE to focus solely on a child's academic progress, and ignore his emotional and social issues. This is precisely what the hearing officer's decision did when it

focused almost entirely on the fact that Joshua had thus far moved from grade to grade with passing marks. The needs of a child with Asperger's Disorder are highly complex. For children like Joshua, an adequate IEP must be multifaceted in order to permit them to benefit from instruction, and eventually become employable and self-sufficient as the IDEA contemplates. By way of background, Asperger's Disorder is a form of autism. Children with Asperger's Disorder are at least average in cognitive and language ability. However, they also have difficulties with social interactions, and frequently need explicit instruction on the social skills that most children acquire naturally. They tend to be very concrete thinkers, and have particular trouble with inferential and non-literal interpretations, which in turn creates difficulty with language acquisition and communication with others. They also have difficulty with "executive" skills, like organization, planning, and shifting focus. They engage in repetitive behaviors, often developing obsessive interests. They also tend to have difficulties with emotional regulation, and are prone to anxiety and depression. (Tr. 12/1/05, p. 11-19.) These deficiencies seriously hamper their ability to benefit from the education of which they would be intellectually capable, as well as their ability to become employable and independent, as contemplated by the IDEA.

It is also important to observe – as the hearing officer failed to do – that the District's failure to offer appropriate services in the past had aggravated Joshua's problems, and caused him to become seriously emotionally fragile. The record before the Hearing Officer was replete with evidence that Joshua's disability and needs had been overlooked by the District for many years – and, as a direct result, had snowballed. From the beginning of his school career, in kindergarten, Joshua's deficits in typical problem areas for Asperger's children – social skills, organization, and auditory processing -- were manifest, and had been observed by a number of his teachers. Nevertheless, the District disregarded his parents' requests that he be evaluated for special education. When the District finally evaluated Joshua in the beginning of his third grade

year, they did not find him eligible for special education. (Tr. 10/31/05, p. 12-19, 31.) It was not until Joshua's parents had Joshua evaluated by Dr. Jessica Hopkins – whom the District itself consults for outside evaluations – that the District found Joshua eligible, based upon Dr. Hopkins' conclusion that Joshua suffered from Asperger's Disorder. (Tr. 10/31/05, p. 36; 11/3/05, p. 199; 12/1/05, p. 36.)

Even after finding Joshua eligible for special educational services, the District continued its failures to meet his needs. The District finally developed an IEP for Joshua that was to take effect on January 7, 2005. (Ex. AB-1.) Dr. Hopkins' evaluation had included a number of recommendations for appropriate educational programming for Joshua. In particular, Dr. Hopkins recommended a small classroom of no more than 12-15 students with both a mainstream and special education teacher. She also recommended a great deal of structure. She also recommended staff training and collaboration. She also recommended that Joshua receive support in social and language skills, emotional regulation, and organization. (Tr. 12/1/05; p. 22-30; Ex. A-7.)

To some extent, the District incorporated Dr. Hopkins' recommendations into Joshua's IEP. (Tr. 11/3/05, p. 199.) Joshua, however, was to remain in his third-grade class of approximately 19 children – far more than Dr. Hopkins recommended. (Tr., 10/31/05, p. 100; Ex. AB-1.) The IEP itself would not be properly implemented. Joshua had very specific needs in the areas of organization and receiving instruction. The classroom teacher failed to follow through on the supports that Joshua was to be given pursuant to his IEP. The classroom teacher failed to follow through on her responsibility to ensure that Joshua's homework binder went home every day. (Tr. 10/31/05, p. 39.) At hearing, Lore Grey, the special education teacher assigned to Joshua, acknowledged that the classroom teacher failed to consistently use the dry-erase board to give Joshua the visual instructions called for in his IEP. Ms. Grey also

acknowledged that the classroom teacher also failed to make sure that Joshua received his assignments when he was out of class. (Ex. AB-1; 11/3/05, p.176, 188-89.) In one instance, this failure led to Joshua's only having half as much time as other children to complete a book report. (Tr. 10/31/05, p. 59.) This failure was particularly serious, as Joshua's identified weaknesses were written output. (Ex. AB-1.) Ms. Grey also admitted that the teacher also failed to give Joshua the word lists and notes called for in his IEP in a timely fashion. (Tr. 11/3/05, p. 177-78; Ex. AB-1.) Ms. Grey would ultimately admit that she simply had not been able to implement Joshua's IEP to a level acceptable to her. (Tr. 11/3/05, p. 113.)

Joshua was treated inappropriately in other ways. Ms. Grey recalled an incident wherein she had given the classroom teacher a sign to remind Joshua not to call out. Instead of putting the sign up on the blackboard, the teacher instead put the sign on Joshua's desk, thus singling him out and embarrassing him. (Tr. 11/3/05, p. 185.) Another notable example of inappropriate treatment was an occasion on which Joshua misinterpreted a teacher who had indicated to a group of students: "I am not going to let anybody into my cafeteria until you are quiet." Because of Joshua's disorder, Joshua interpreted the teacher very literally, and believed that the teacher was saying that she owned the cafeteria. When he remarked that he had not known that she owned the cafeteria, he got into trouble for being sarcastic. (Tr. 11/3/05, p. 178-80.) On other occasion, just after he had been given his IEP, he had been disciplined in gym class for not stopping a game when he should. (Tr. 11/3/05, p. 175.) As Dr. Hopkins' testimony would suggest, this incident was not disobedience on Joshua's part, but a manifestation of his inability to process auditory information, particularly in a noisy gym environment. (Tr. 12/1/05, p. 25-26.) These issues arose because the teachers did not receive appropriate instruction regarding Joshua's special needs as Dr. Hopkins had recommended.

The District staff's lack of understanding and follow-through ultimately resulted in compromises to Joshua's safety. On no less than two occasions, Joshua was misplaced in the building. (Tr. 11/3/05, p. 197-98.) Dr. Hopkins had stressed the need for adequate supervision at recess. (Tr. 12/1/05, p. 34-35.) The District failed to provide it. On the advice of the special Education teacher, Dr. and Mrs. Beitle wrote to the building principal. (Tr. 10/31/05, p. 44-45; Ex. A-8.) They never received an answer. (Tr. 10/31/05, p. 45.) Dr. and Mrs. Beitle raised the playground supervision issue at the May IEP meeting. However, the very next week, Joshua suffered injury on the playground when he was being chased by another student. (Tr. 10/31/05, p. 74; Tr. 11/3/05, p. 192; Ex. A-8.)

The hearing officer's decision appears to have acknowledged that this extensive history of educational failures took place. (Decision, p. 16-18.) What the hearing officer apparently failed to appreciate was the fact that these incidents had a serious impact on Joshua's mental health – and even his ability to remain in school. Dr. Hopkins testified that as with many children with Asperger's, Joshua has a tendency to perseverate. (Tr. 12/1/05, p. 41-43.) Even Dr. Marie Meinhold, the expert witness retained by the District, acknowledged at hearing that a lack of consistency and follow-through can cause great distress to an Asperger's child's, and cause him to perseverate. (Tr. 12/2/05, p. 131-32.) Due to tendency to perseverate, a relatively trivial event can be extremely anxiety-provoking for a child with Asperger's. By the end of third grade, Joshua's mental state was fragile, and had been so for some time. By the end of kindergarten, Joshua had already been exhibiting poor self-esteem and a great deal of stress. (Tr. 10/31/05, p. 13.) By the middle of his second-grade year, Joshua had developed full-blown depression and anxiety disorder. (Ex. A-3.) As Joshua's treating psychiatrist, Dr. Gillian Pearis testified, this situation was the direct result of many years of the District's failure to give Joshua adequate supports. (Tr. 11/3/05, p. 21, 43.) Ms. Grey herself admitted that by the end of

Joshua's third grade year, his emotional state had significantly deteriorated. (Tr. 11/3/05, p. 114.) By this time, Dr. Pearis had put him on Prozac. (Tr. 11/3/05, p. 9, 12, 14, 16.) However, Joshua would come home crying every day. (Tr. 10/31/05, p. 41.) Dr. Hopkins, who had been meeting with him weekly, similarly noted a great deal of stress, and poor self-esteem. (Tr. 12/1/05, p. 37-40.) Often, Joshua had to go home early for stomachaches and headaches. (Tr. 10/31/05, p. 41.) On a number of occasions, Ms. Grey even agreed that he should go home because he was simply unable to learn. (Tr. 10/31/05, p. 42.) Clearly, then, Joshua's placement in the District was not working, but was so detrimental that on some days he was unable to remain in school and receive educational services at all. The hearing officer apparently failed to appreciate this significant fact.

The District was completely unprepared and unable to remedy this situation for Joshua's fourth grade year. The hearing officer's determination that the District was prepared to offer Joshua a FAPE for his fourth grade year is unworthy of deference because she ignored the clear evidence that the IEP offered for that year was still deficient. Even Dr. Meinhold testified that these deficiencies existed. Appropriate advance planning and organization is essential to providing the structure that a child like Joshua needs. As Dr. Meinhold suggested, it was of great importance to ensure that Joshua got off on the right foot and did not have another failure experience. (Tr. 12/2/05, p. 135.) Unfortunately, the District was not at all prepared to see that this took place.

The extent of the District's disorganization and lack of understanding was apparent from the very beginning of the programming for this year. As early as the May, 2005 IEP meeting, the Beitles tried to discuss Joshua's educational planning for this year. The Beitles were particularly concerned because Joshua and his classmates would be moving to a new school for his fourth grade year. The hearing officer concluded that there was a transition plan in place. It is true that

Joan Souza, the Principal of Joshua's new school, did testify at hearing as to the steps for the transition of students who would be starting the fourth grade. (Tr. 12/1/05, p. 213.) What the hearing officer apparently failed to comprehend that in Joshua's case, there was little or no evidence of any follow-through. As late as May, the District was unable to provide the Beitles with so much as the name of a contact person at the new school. (Tr. 12/2/05, p. 140.) Dr. Beitle made a written request for an IEP meeting on or about August 5, 2005. (Tr. 12/2/05, p. 146.) The District's Special Education Director admitted at hearing that no action was taken on that request until at least August 17, 2005. (Tr. 12/2/05, p. 169.) The September 2, 2005 meeting itself did not take place until *after* school had started in September. (Tr., 12/1/05, p. 230.)

Once that IEP meeting was convened, the District did nothing to address the deficiencies of their performance, which had already been seriously detrimental to Joshua and aggravated his emotional fragility. If anything, Joshua was to be left worse off than before. Under the proposed IEP, Joshua would have been placed in a class of 23 children – an even larger classroom than the previous year. Two had IEPs, and another two had Section 504 plans. (Tr. 12/1/05, p. 163.) Dr. Pearis testified that a classroom of 23 students would be unacceptable. Dr. Pearis testified that in her opinion, Joshua requires an accepting, small environment of less than 10 but no more than 12 children so that he can socially navigate. Furthermore, a classroom of 23 students would make it difficult for Joshua to learn because he is sensitive to noise, and his central auditory processing deficits make it difficult to delineate noise. Dr. Pearis testified that she was concerned that if Joshua were placed in a classroom of 23 students, he would develop depression again. (Tr. 11/3/05, p. 18-22.) Dr. Hopkins similarly testified that Joshua required a smaller classroom, a more structured environment, and more teachers who were trained in working with Asperger's. (Tr. 12/1/05, p. 46.) For that matter, the hearing officer completely overlooked the fact that Dr. Meinhold questioned whether Joshua should be in the regular classroom at all. Dr. Meinhold

testified that it would have been more appropriate for him to be housed in a special education classroom similar to Ms. Grey's, and that he go into the regular classroom only at scheduled times. (Tr. 12/2/05, p. 107-08.) Ms. Souza also admitted that nobody had made any specific plans for dealing with the issues of classroom noises and other potential sources of sensory overload. (Tr. 12/2/05, p. 22-23.)

The hearing officer also appears to have overlooked the fact that Dr. Meinhold herself identified another fatal gap in the proposed IEP that would have rendered it unworkable. Dr. Meinhold testified that one of the major strengths of Joshua's third-grade IEP was the availability of Ms. Grey as a resource. When Joshua was feeling overwhelmed, Joshua could go to her room to work out his difficulty. He could also go to her to work on his relaxation, social skills, lesson preparation, and other such matters. (Tr. 12/2/05, p. 92.) Dr. Meinhold also testified as to the great need of one-on-one attention that Ms. Grey had provided. (Tr. 12/2/05, p. 134.) There was no equivalent to that resource under the new IEP. Although the Speech-Language Pathologist, Ms. Osier, was identified to serve as Joshua's new case manager in the place of Ms. Grey, her schedule would have plainly prevented her from giving her the one-on-one attention Joshua needed. (Tr. 12/1/05, p. 171-174.) Ms. Souza similarly admitted that the IEP contained no plan for when Joshua needed to leave the classroom. (Tr. 12/2/05, p. 35.) The hearing officer's decision did not address this glaring deficiency.

There was also evidence that the models for Joshua's services such as speech and language therapy were lacking. Joshua is very distinguishable from a child with a lisp or a stutter. A major part of Joshua's speech and language difficulties are not in the mechanics of speech, which can be practiced in isolation. A child with Asperger's instead has difficulty in the social uses of speech. As Ms. Osier testified, children with Asperger's may learn one of their speech and language skills in isolation, but will be unable to generalize it into other contexts.

Therefore, using the pull-out approach for Joshua's speech and language, as was contemplated, would in all likelihood be inappropriate, because it was not taking place in the natural context in which those skills would be utilized. (Tr. 12/1/05, p. 178.) This was also the opinion of Dr. Hopkins. (Tr. 12/1/05, p. 50.) Unfortunately, the hearing officer did not address this issue. In fact, she even ignored Dr. Meinhold's testimony, which suggested that "there's no way to work on" a lot of Joshua's goals "just in the mix of the regular educational setting." (Tr. 12/2/05, p. 108.)

Support was also lacking in other areas. Although the IEP references "paraprofessional support," there was no clear statement as to the extent to which the paraprofessional would be available, or the role that the paraprofessional would play. This weakness was very serious. According to Ms. Souza's testimony, this paraprofessional would be shared with the other special-needs children. (Tr. 12/1/05, p. 215.) However, Dr. Meinhold herself testified that Joshua should have been offered one-on-one paraprofessional support up front, in order to ensure that Joshua had a successful experience from the beginning. (Tr. 12/2/05, p. 135.) At the IEP meeting, Dr. and Mrs. Beitle specifically asked for a one-on-one aide, but were denied. (Tr. 12/2/05, p. 149, Affidavit.)

The hearing officer overlooked these serious deficiencies, focused on the fact that Joshua had progressed from grade to grade thus far, and appears to have assumed that he would "get by" again this year. This reasoning is legally flawed. Furthermore, the hearing officer also overlooked another crucial piece of evidence. The hearing officer's decision completely ignored the fact that it was Joshua's parents, not the District, that provided Joshua with the tutoring and summer programs that allowed him to work on his deficits before and after being found eligible. (Tr. 10/31/05, p. 13, 16-17, 28-29, 86-87.) The hearing officer, then, failed to take into account

that it was Joshua's parents, not the District, which provided Joshua that he needed in order to "get by" from grade to grade.

In short, the Hearing Officer plainly misapplied the law, and overlooked crucial facts indicating that Joshua was not being offered a FAPE. FAPE had been denied Joshua in the past, to the point where Joshua's mental and emotional state and reached a crisis point. It has been held that FAPE will require a private placement or placement in another district under these circumstances. *See, e.g., Greenbush Sch. Comm. v. Mr. and Mrs. K.*, 25 IDELR 200 (D.Me. 1996); *South Royalton Sch. Dist.*, 27 IDELR 920 (Vt. SEA 1998). Under the proffered IEP, FAPE would continue to be denied because the IEP failed to address Joshua's serious social and emotional problems. In the face of the crisis, the District offered fewer supports when what was needed was more. For that reason, the hearing officer's finding that the District offered FAPE should be overturned.

## B. THE PLACEMENT AT WOLF WAS APPROPRIATE.

In addition to establishing that the school district failed to offer a FAPE, a parent seeking tuition reimbursement must also establish that their unilateral placement was "appropriate." SPED Regs § 300.403(c). The hearing officer's decision does not specifically address the issue of whether Wolf was inappropriate, apparently due to the fact that she had already found that the District had offered a FAPE. However, in light of the fact that the District has strenuously argued that Joshua's placement at Wolf was inappropriate because it did not provide him with an education in the "least restrictive environment," we address that point here.

Under the SPED Regs, parental placements are held to a somewhat different standard than those made by the district. Pursuant to SPED Regs § 300.403(c), a placement may be deemed "appropriate," and therefore reimburseable, even if it does not meet the same standards to which the District would be held. *See Florence County v. Carter*, 510 U.S. at 14. The

parental placement of course must provide educational benefit. *See Menlo Park City Elementary Sch. Dist.*, 35 IDELR 202 (Cal. SEA, 2001); *Alamo Heights Independent Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986). More importantly, from our perspective, there is also some relaxation of the "least restrictive environment" standard. A number of circuits have explicitly rejected the proposition that a parental placement must be in the "least restrictive environment." *See M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 (3d Cir. 1999); *Cleveland Heights-University Heights Sch. Dist. v. Boss*, 144 F.3d 391, 400 (6th Cir. 1998); *Bd. of Educ. of Murphysboro Community Unit Sch. Dist. v. Illinois State Bd. of Educ.*, 41 F.3d 1162 (7th Cir. 1994); *Menlo Park.*

The rationale for relaxing the "least restrictive environment" standards are well-grounded in the goals of the IDEA. As the Sixth Circuit has observed, in most cases, the only viable alternative for parental placements is a private school that only accepts disabled children. *See Cleveland Heights* at 400, n.7. Accordingly, if we were to limit parent placements only to the "least restrictive environment," then that would be to say that the student must languish in a clearly inappropriate educational environment offered by the public school and be denied a more appropriate education in a private placement. *See Cleveland Heights* at 400. Holding parents to the "least restrictive environment" standard, then, would work to eviscerate the private placement remedy. *See Cleveland Heights* at 400.

Our own First Circuit has apparently not yet had the opportunity to fully explore the issue of whether parental placements must be in the "least restrictive environment." In the recent case of *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26 (1st Cir. 2002), the First Circuit held that mainstreaming cannot be *completely* ignored in unilateral placements, even to maximize academic achievement. *Id., citing Roland M.*, 910 F.2d at 992-93. However, the First Circuit

has never gone as far as to hold that that the parents' placement must be strictly within the "least restrictive environment" standard to which the district would be held. In fact, in an earlier case, that of *Colin K. v. Schmidt*, 715 F.2d 1 (1st Cir. 1983), the First Circuit strongly suggested that where the school district offered an inadequate IEP, parental placements did not necessarily need to be in the "least restrictive environment." In *Colin K.*, the Middletown school district had argued on appeal that the District Court for Rhode Island had erred in ordering it to continue funding placement at a private, residential placement because that placement was allegedly not in the "least restrictive environment." The lower court had found that the IEP offered by the school district was inadequate. The children in question had been at the private, residential placement for two years, and had at least been provided an adequate special education. Therefore, district court had ordered continued tuition payments until the school district offered an adequate IEP. *See id.* at 7. The First Circuit approved of the district court's decision, finding that it ". . . reflects a sensible accommodation of the state's interest in shaping the children's educational programs and the children's interest in receiving sufficient educational attention while those programs are being developed." *See id.* at 7-8.

The uncontroverted evidence demonstrates that the Wolf School is "appropriate" pursuant to the SPED Regs. First, the Wolf School is providing the educational benefits that Joshua was denied and would continue to have been denied in the District. The extensive testimony on the record shows that Wolf is offering the type of educational setting and services that Joshua requires. Unlike the District, the Wolf staff is fully prepared to deal with children suffering disabilities like Joshua's. (Tr. 11/3/05, p. 144.) Because he is in a small group, he receives the individual attention that has been identified as one of his most important needs. Joshua also receives the structure that he needs. (Tr. 11/3/05, p. 130-32.) Joshua receives explicit assistance in his specific problem areas, such as social and language skills. (Tr. 11/3/05, p. 139-42.) More

importantly, he receives education in those skills right in the very setting in which he would use them. (Tr. 11/3/05, p. 143.) This makes it easier for Joshua to generalize. (Tr. 12/1/05, p. 50.)

In the opinion of Dr. Hopkins, the program at Wolf meets Joshua's needs. (Tr. 12/1/05, p. 54.) Joshua is plainly thriving at Wolf. Most significantly, he is happier and more confident, and functions better. He is capable of completing his homework in a reasonable amount of time. He is motivated to go to school. He has also made several new friends. (Tr. 10/31/05, p. 51-52.) This assessment was corroborated by Dr. Pearis. (Tr. 11/3/05, p. 22.)

Secondly, the placement at the Wolf School is not unduly restrictive, and does not completely ignore mainstreaming. As the First Circuit pointed out in the case of *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983 (1st Cir. 1990), the question of whether a unilateral placement is "appropriate" in terms of mainstreaming requirements is always going to be one of balance:

> Correctly understood, the correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities. [citations omitted] *To determine a particular child's place on this continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement.* [cite omitted] Assaying an appropriate educational plan, therefore, requires a balancing of the marginal benefits to be gained or lost on both sides of the maximum benefit/least restrictive fulcrum. Neither side is automatically entitled to extra balance.

*Id.* at 993 (Emphasis added.)

In Joshua's situation, the transfer to Wolf was necessary to ensure that he could continue to make reasonable educational progress. The simple fact of the matter is that the regular classroom environment – which was the *only* option that was offered by the District -- is too overwhelming for Joshua at this present time, and is even actively detrimental to his emotional well-being. Last year, Joshua was anxious and depressed, and also suffered very low self-esteem. (Tr. 12/1/05, p. 29-30.) That situation could only impede his academic progress.

Indeed, as we discussed earlier, as of last year, Joshua's mental state had deteriorated to the point where he could not remain in school on a number of days

Joshua's difficulties with social skills is also worthy of consideration when determining whether Wolf is an appropriate placement. (Tr. 12/1/05, p. 14.) Courts have recognized that it hardly benefits a child to be in a mainstream environment if he lacks the skills to participate in it. A child in that situation can only be an "island in the mainstream" rather than a fully functioning member of the school community. *See Hudson v. Bloomfield Hills Pub. Sch.*, 910 F.Supp. 1291, 1300 (E.D. Mich. 1995). As Dr. Meinhold testified, when a child is not at the same level as his peers, the entire school experience is punishing and frustrating. (Tr. 12/2/05, p. 103.) Indeed, in the District, Joshua felt ostracized because he had had so much difficulty in making friends. (Tr. 11/3/05, p. 11-12; 11/15/05, p. 63.) The sense of being ostracized, of course, would only worsen his psychiatric problems. At Wolf, Joshua has a chance to feel more like a member of the school community. Because he is with other children that are closer to his level, he is no longer isolated, but is making friends and having opportunities to improve his social skills. Joshua, then, is being mainstreamed to the extent that he is capable at this time.

It is also worth noting that Wolf does not seek to shelter children like Joshua from ever having to deal with the outside world, but renders them capable of negotiating it. As Ms. Granoff indicated, one of Wolf's goals is to eventually permit their students to go to public schools. Children are continually evaluated to determine whether they are ready. In fact, all of Wolf's first graduating class has gone to independent high schools. (Tr., 11/3/05, p. 148.)

The Wolf School, then, has provided Joshua with appropriate educational programming. The District may have been able to provide Joshua with more opportunities for non-disabled peers. The benefit of this opportunity is seriously outweighed by the fact that in the District, Joshua was also given the opportunity to experience serious emotional damage that impeded

even his ability to remain in school at all. The Wolf School, on the other hand, is providing Joshua with the intensive instruction that he will require in order to overcome his disability, and become a fully functioning member of society. For that reason, the Wolf School was an entirely appropriate placement for Joshua.

## C. DR. AND MRS. BEITLE ARE ENTITLED TO REIMBURSEMENT FOR THE SUMMER PROGRAM.

Under the circumstances, Dr. and Mrs. Beitle also should be reimbursed for the Wolf summer program provided to Joshua. SPED Regs § 300.309 specifically provides that school districts are required to provide summer programming where necessary to provide FAPE. In Joshua's situation, summer programming was clearly necessary. The District failed to make any offer of extended year services at the May, 2005 IEP meeting. (Tr. 10/31/05, p. 48; Tr. 12/2/05, p. 143.) The Special Education Teacher tried to defend this omission, claiming that extended year services were not discussed "because he didn't require them." (Tr. 11/3/05, p. 195-96.)

This appears to have been a pre-judgment on the part of the District, and a seriously inaccurate one at that. We have heard extensive testimony indicating that from the beginning of Joshua's school career, Dr. and Mrs. Beitle's provision of summer programming and tutoring during the year has been integral to ensuring that Joshua could make any educational progress. (Tr. 10/31/05, p. 13, 16-17, 28, 86-87; Tr. 11/3/05, p. 122.) In particular, the extended year programming ensured that Joshua could make progress in his acquisition of social skills, sensory processing, and social communication. (Tr. 11/3/05, p. 122.) In short, the extended year programming provided by Dr. and Mrs. Beitle has always acted as a kind of compensatory service for the District's failures to provide FAPE. Dr. and Mrs. Beitle therefore should be reimbursed for having provided those services.

## III. CONCLUSION

Because Joshua was not provided with a FAPE, and because Joshua's placement at Wolf is appropriate, the School District should be directed to reimburse Joshua's parents for tuition. Furthermore, the District should be directed to reimburse Joshua's parents for the summer program at Wolf for 2005.

David Beitle and Julie Beitle,
By their attorney,

Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888

## CERTIFICATION

I, the undersigned, hereby certify that on June 9, 2006 I sent a true copy of the within by regular mail to Raymond Marcaccio, Oliverio & Marcaccio, 55 Dorrance Street, Suite 400, Providence, RI 02903.