UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID BEITLE and JULIE BEITLE, :
as parents and next friends of JOSHUA BEITLE :
Plaintiffs :
: C.A. No. C.A. 06-62
v. :
:
EAST GREENWICH SCHOOL COMMITTEE :
Defendant :

**PLAINTIFFS' STATEMENT OF FACTS**

Pursuant to Fed. R. Civ. P. 56(a) and Local Rule 12.1(a)(1), the Plaintiffs hereby set forth a concise statement of all material facts:

1. Joshua Beitle entered the East Greenwich Public Schools as a kindergartener in September, 2001. From his kindergarten year through his third grade year, Joshua experienced significant difficulties with time management and work completion, reading skills, and social interactions with other children. (Tr. 10/31/05, p. 9, 12, 17-18.)

2. During Joshua first grade and kindergarten years, Mrs. Beitle spoke to Joshua's teachers regarding testing, but was informed that that would not be necessary. In September of his third grade year, the District performed some testing on Joshua, but did not find Joshua eligible for special education. (Tr. 10/31/05, p. 12-16, 31.)

3. During his school career in the District, Joshua's parents provided him with tutoring and other supports, at their own expense, to ensure that he was able to make academic progress. (Tr. 10/31/05, p. 13, 16-17, 28-29, 86-87.)

4. Joshua's school difficulties caused him to have serious problems with self-esteem. Beginning in kindergarten, he started to have nightmares, and screaming that he could not do the work, that he was dumb, and that he was stupid. Later, he would begin to have temper tantrums, and developed a facial tic. By second grade, the Children's Development Center at Rhode Island

Hospital concluded that Joshua's school problems resulted in Anxiety Disorder, and recommended that Joshua enter psychotherapy in order to deal with this issue. Joshua's parents accordingly arranged for him to see a psychologist. (Tr. 10/31/05, p. 13, 20-21; Ex. A-3.)

5. Joshua's parents provided evaluations in the areas of speech and language evaluations, central auditory processing examination, and occupational therapy. (Tr. 10/31/05, p. 16-20.) Shortly after the District found Joshua ineligible for special education in the fall of 2004, Joshua's parents arranged for an evaluation by Dr. Jessica Hopkins at the Neurodevelopment Center in Providence. (Tr. 10/31/05, p. 31; Tr. 12/1/05, p. 8; Ex. A-7.) By this time, Joshua was in the third grade. (Tr. 10/31/05, p. 100.)

6. At hearing, Dr. Hopkins qualified as an expert psychotherapist who deals with children with autistic spectrum disorders. (Tr. 12/1/05, p. 8.) Dr. Hopkins performs outside evaluations for the District. (Tr. 11/3/05, p. 199; Tr. 12/1/05, p. 36.)

7. As a result of the evaluation process, Dr. Hopkins concluded that Joshua's profile was consistent with Asperger's Disorder. (Tr. 12/1/05, p. 11; Ex. A-7.) Asperger's Disorder is one of the autism spectrum or pervasive development disorders. The difference between children with Asperger's Disorder and other children with autism spectrum or pervasive development disorders is that children with Asperger's Disorder have at least average cognition and language skills. Children with Asperger's Disorder, however, do have great difficulty in social application of language and understanding social conventions, and understanding multiple perspectives. Children with Asperger's Disorder also have difficulty with narrative skill, inferential and non-literal interpretations of words. Children with Asperger's Disorder also tend to be prone to catastrophic thinking. They also have difficulty with emotional regulation. As a result, they are prone to anxiety and depression, and become easily overwhelmed. Children with Asperger's Disorder also have difficulty with organization, planning, and shifting focus. As an extension of

the difficulties with changing focus, children with Asperger's Disorder have a difficult time coping with transitions and novel situations. Also as an extension of this difficulty with organization, children with Asperger's Disorder also tend to have trouble with written language. Children with Asperger's Disorder also tend to have sensory integration difficulties, and are therefore easily distractible and overwhelmed by ordinary stimuli, such as a noise in the hallway. (Tr. 12/1/05, p. 18-20; 12/2/05, p. 17-18.)

8. Based upon Dr. Hopkins' evaluation, the District found Joshua eligible for special education based upon an autism spectrum disorder. (Tr. 10/31/05, p. 36.)

9. As part of her evaluation, Dr. Hopkins made extensive recommendations regarding Joshua's educational programming. Among her recommendations was an integrated classroom. By an integrated classroom, she meant a smaller classroom of about 12-15 students with both a mainstream and special education teacher. If this was not available, she recommended a home-based classroom with regular education students in addition to his inclusion classroom. She also recommended that everybody who would be interacting with Joshua be trained in autism spectrum disorder. She also recommended a highly structured classroom program. Because of Joshua's language issues, Dr. Hopkins also included instructions on how to interact with Joshua. Dr. Hopkins also recommended work on inferential reasoning, written language, and organization issues. Dr. Hopkins also recommended work on social skills, including ongoing guidance during the day, social stories, and rehearsals. Dr. Hopkins also recommended assistance in self-regulation and coping, and maintaining self-esteem. Dr. Hopkins observed that physical education and recess are often a problem with Asperger's children because it involves a lot of motor planning and social interaction. Dr. Hopkins stressed the importance of additional supervision. (Tr. 12/1/05, p. 23-34.)

10. The IEP developed by the District called for Joshua to remain in his third grade class of approximately 19 children for most of the day. (Tr., 10/31/05, p. 100; Ex. AB-1.) Joshua was also assigned to a special education teacher, Lore Grey, for resource help. In particular, Ms. Grey's classroom also served as a "time out" area when he was overstimulated, or when he needed help in coping with social situations. (Tr. 11/3/05, p. 110, 230-32.)

11. During the remainder of Joshua's third grade year, Joshua's mother brought to the attention of Ms. Grey numerous instances wherein Ms. Grey's attempts to implement the IEP were not followed through on. (Tr. 10/31/05, p. 39.) These failures especially occurred in the areas designed to assist Joshua with his organization and processing issues, such as receiving class assignments, notes, written instructions, homework supports, and the like. (Tr. 10/31/05, p. 32, 62, 59; Tr. 11/3/05, p. 176-177, 188-89; Tr. 11/15/05, p. 66.) Ms. Grey acknowledged that on several occasions, Joshua had been disciplined for misunderstandings that were the result of Joshua's language and sensory processing difficulties. (Tr. 11/3/05, p. 175, 178-80.) At hearing, Ms. Grey acknowledged that she had been unable to implement Joshua's IEP to an acceptable level. (Tr. 11/3/05, p. 113.)

12. As the year progressed, Joshua anxiety levels had worsened severely. (Tr. 12/2/05, p. 41.) Joshua would come home crying every day, and often had to go home early for stomachaches and headaches brought on by anxiety. (Tr. 10/31/05, p. 41-42; 11/3/05, p. 114; 12/2/05, p. 163.)

13. Dr. Hopkins continued to see Joshua for weekly psychotherapy. Joshua presented with a great deal of anxiety and overstimulation regarding school. Joshua would perseverate on the problems brought about by the failures to implement his IEP, and begin to feel very hopeless and negative. This is typical of children with Asperger's. During his weekly sessions with Dr. Hopkins, Joshua also presented with self-esteem issues, continually referring to himself as

stupid, dumb, having no friends. As the year progressed, Dr. Hopkins perceived that Joshua's school situation was not workable, and was contributing to Joshua's stress. Dr. Hopkins testified that Joshua's parents had become very effective at implementing strategies for Joshua at home. Therefore, she ascribed Joshua's stress and anxiety to his school situation. (Tr. 12/1/05, p. 37-46.)

14. Dr. Pearis, who began seeing Joshua shortly after Dr. Hopkins' evaluation, qualified as an expert in child and adolescent psychiatry. After an evaluation, Dr. Pearis concluded that Joshua was depressed, and that his social anxiety levels were extremely high. Dr. Pearis also opined that Joshua's depression and anxiety was the result of not having any friends at school except for one child, and was also the culmination of many years of not being very well supported at school in terms of their understanding his Asperger's Disorder. (Tr. 11/3/05, p. 6, 8-11, 18, 21, 43.)

15. Beginning in December, 2004, Dr. Pearis prescribed Prozac to help Joshua deal with his depression and anxiety. Dr. Pearis continued to see Joshua for approximately the next four to eight weeks. During those visits, Joshua would report that he did not have any friends in school, and that he did not like school. (Tr. 11/3/05, p. 9, 12, 14, 16.)

16. Another IEP meeting was held in the beginning of May. (Tr. 10/31/05, p. 45; Tr. 12/2/05, p. 141.) This meeting had been called by Joshua's special education teacher and his case manager to go over the problems that Joshua had been having, as well as playground supervision issues, and also the lack of implementation of various plans. (Tr. 10/31/05, p. 46; Tr. 12/2/05, p. 141.) No extended year services were offered at the May IEP meeting. (Tr. 10/31/05, p. 48; Tr. 12/2/05, p. 143.) As Ms. Grey indicated, they were not discussed "because he didn't require them." (Tr. 11/3/05, p. 195-96.) Ms. Grey did try to respond to the issues raised about playground supervision. However, Joshua was injured on the playground the week after that

meeting, during an incident in which the aide that was supposed to have been watching the playground was not present. (Tr. 10/31/05, p. 74; Tr. 11/3/05, p. 192; Tr. 12/2/05, p. 141.)

17. In May, 2005, Dr. Beitle discussed Joshua's fourth-grade programming with the Special Educator, but Ms. Grey was unable to provide any information. (Tr. 12/2/05, p. 140.)

18. Joshua's parents provided him with services over the summer. This included a social group once a week. Joshua also went to the three-week summer program at Wolf again. (Tr. 10/31/05, p. 48.) He also went to a social group for seven weeks with the Autism Project of Rhode Island. (Tr. 10/31/05, p. 48.)

19. Dr. Pearis testified that Joshua's mental state improved over the summer. (Tr. 11/3/05, p. 86-87.) Similarly, Dr. Hopkins testified that Joshua made progress in the summer program, especially in social skills, and appeared to have a lot less anxiety. (Tr. 12/1/05, p. 51-52.)

20. An IEP meeting was held on September 2, 2005. Dr. Beitle had requested that IEP meeting on or about August 5, 2005. (Tr. 12/2/05, p. 146.) (Tr. 10/31/05, p. 49; Ex. AB-2; Tr. 12/1/05, p. 220.) Joshua would be moving on to a different school for fourth grade. (Tr. 12/1/05, p. 211.)

21. A new IEP was generated. Under that IEP, Joshua was to be placed in a regular classroom under Pamela Testoni, and would receive other services outside the classroom, including the teaching of social skills. (Ex. AB-2.)

22. The District's expert witness, Dr. Patricia Meinhold, testified that she felt that Joshua should have been placed in a special education classroom like Ms. Grey's for his "home base," and that he go into the regular education setting for scheduled times. (Tr. 12/2/05, p. 107-08.)

23. Joshua's proposed classroom teacher, Pamela Testoni, testified that her classroom had 23 students. Two of them had IEPs, and two had Section 504 plans. (Tr. 12/1/05, p. 163.)

24. Dr. Pearis testified that a classroom of 23 students would be unacceptable. Dr. Pearis testified that in her opinion, Joshua requires an accepting, small environment of less than 10 but no more than 12 children so that he can socially navigate. Furthermore, a classroom of 23 students would make it difficult for Joshua to learn because he is sensitive to noise, and his central auditory processing deficits make it difficult to delineate noise. Dr. Pearis testified that she was concerned that if Joshua were placed in a classroom of 23 students, he would develop depression again. (Tr. 11/3/05, p. 18-22.) Dr. Hopkins similarly testified that Joshua required a smaller classroom, a more structured environment, and more teachers who were trained in working with Asperger's. (Tr. 12/1/05, p. 46.)

25. Ms. Souza admitted that no accommodation had been made for the noise factor, but that it had been decided that these environmental considerations would be addressed when Joshua arrived. (Tr. 12/2/05, p. 22-23.)

26. Dr. Hopkins testified that the pull-out model for teaching social skills is inappropriate because the skills that Joshua needs should be taught in as the need for them arises in everyday situations. This was difficult to implement at Joshua's third-grade school. (Tr. 12/1/05, p. 50.) The Speech-Language Pathologist for the District, Jessica Osier, similarly testified that children with Asperger's will learn a skill in one context, but have difficulty generalizing that skill into other contexts. This is particularly so in social skills. The pull-out approach, according to Ms. Ossier, also presents problems in that the child is missing classroom activities, and/or the child not wish to be singled out. (Tr. 12/1/05, p. 178-80.)

27. Dr. Meinhold indicated that she felt that one of the strengths of Joshua's IEP for the third grade had been Ms. Grey's ability to be available to meet Joshua's needs and engage in other problem-solving, especially in the areas of relaxation, social skills, lesson preparation, etc. (Tr. 12/2/05, p. 92, 108.)

28. Ms. Souza acknowledged that the IEP contained no plan for when Joshua needed to leave the classroom. (Tr. 12/2/05, p. 35.)

29. Although Ms. Osier was selected as Joshua's case manager by the IEP team because all of his goals were language based, she would not be a day-to-day resource for Joshua as Ms. Grey had been. Her schedule committed her to other tasks most of the time. (Tr., 12/1/05, p. 171-74, 183, 192.)

30. Dr. Meinhold testified that after she had reviewed Joshua's IEP and supporting documentation, she had indicated that the District should have provided more training and support for regular education staff to prevent the misunderstandings and problems that had taken place last year, as well as more paraprofessional support. (Tr. 12/2/05, p. 95-96, 109.)

31. Dr. Meinhold testified that although Joshua might need less paraprofessional support later, she believed that one-on-one support would have to be provided first rather than added later because, a failure experience would be detrimental. (Tr. 12/2/05, p. 134-35.)

32. The District did not provide for a one-on-one aide at the September 2, 2005 IEP meeting. (Tr. 12/2/05, p. 149; Affidavit.)

33. Joshua's parents rejected the IEP that was developed at the September 2, 2005 meeting because they felt it did not address Joshua's needs, and therefore placed him at Wolf. (Tr. 10/31/05, p. 50-51, 96.)

34. At Wolf, all of the children are of average or above average intelligence. However, they have issues with social skills, sensory processing, and receptive and expressive language. (Tr. 11/3/05, p. 122-23.)

35. Wolf works on an "immersion" model. The child is never pulled out of the classroom to receive services. In the opinion of Wolf School teacher Ms. Rosaline Granoff, the pull-out model is inappropriate because the children miss out on learning opportunities and are made to

feel less a part of the school community. In the immersion model as followed by Wolf, the classroom teacher, speech pathologist, and occupational therapist collaboratively plan a lesson so that it is customized to each child in the classroom. (Tr. 11/3/05, p. 172-73.)

36. One goal of Wolf School is to permit the students to go to or return to their sending district's school with less intensive supports. The entire first graduating class has moved up to independent high schools. Children are continually evaluated to determine whether they are able to return to a less therapeutically intense environment. (Tr. 11/3/05, p. 148.)

37. When Joshua was admitted to Wolf, Wolf prepared a set of goals largely based upon the evaluations that had been provided. Ms. Granoff provided extensive testimony regarding the means by which the Wolf School is working to improve Joshua's social and language skills and sensory processing, and also the means by which these efforts are integrated into the day-to-day routine of the classroom. (Tr. 11/3/05, p. 129-30, 137-43; Ex. A-13.)

38. Joshua's mental state and social situation has dramatically improved at Wolf. He is much happier and confident. He is now capable of sitting down and doing his homework in 20 minutes. Before, it took three hours, with tantrums. Joshua is also motivated to go to school, and has friends over for play dates. (Tr. 10/31/05, p. 51-52; Tr. 11/3/05, p. 22.) In Dr. Hopkins's opinion, the Wolf program meets Joshua's needs. (Tr. 12/1/05, p. 54.)

Respectfully submitted,
David Beitle and Julie Beitle,
By their attorney,

Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888

**CERTIFICATION**

I, the undersigned, hereby certify that on June 9, 2006 I sent a true copy of the within by Regular Mail to Raymond Marcaccio, Oliverio & Marcaccio, 55 Dorrance Street, Suite 400, Providence, RI 02903.

Maureen L. Guyoui