UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID BEITLE and JULIE BEITLE<br>as parents and next friends of JOSHUA BEITLE<br>*Plaintiffs* | : | |
| v. | : | C.A. No. C.A. 06-02 |
| EAST GREENWICH SCHOOL COMMITTEE<br>*Defendant* | : | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Defendant, the East Greenwich School Committee, and hereby moves for summary judgment with respect to Plaintiff's claims in this case on the grounds that the decision of the Hearing Officer should be affirmed in all respects. In support of its motion, Defendant relies upon the accompanying Memorandum of Law, Defendant' Statement of Facts, Defendant's Response to Plaintiffs' Statement of Facts, and the record below.

EAST GREENWICH SCHOOL COMMITTEE,

By their Attorneys,

Christine M. Curley (RM)

Raymond A. Marcaccio, Esquire (#3569)
Christine M. Curley, Esquire (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax

**CERTIFICATION**

I hereby certify that a true copy of the foregoing Defendant's Motion for Summary Judgment was sent regular mail to Mary Ann Carroll, The Law Offices of Stephen M. Robinson, 155 South Main Street, Suite 402 Providence, RI 02903 on the 14th day of July, 2006.

________________________

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID BEITLE and JULIE BEITLE as parents and next friends of JOSHUA BEITLE *Plaintiffs* | : | |
| v. | : | C.A. No. C.A. 06-02 |
| EAST GREENWICH SCHOOL COMMITTEE *Defendant* | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs David Beitle and Julie Beitle ("Plaintiffs") have brought this claim against the East Greenwich School Committee (the "District") seeking reversal of the decision of the hearing officer below after a due process hearing requested by the Plaintiffs. At the hearing below, Plaintiffs sought reimbursement for their unilateral decision to privately place their son, Joshua Beitle, at The Wolf School for the 2005-2006 school year, as well as reimbursement for the summer camp program he attended between the third and fourth grades. Prior to this move, Joshua Beitle had attended the District's schools, successfully progressing from kindergarten to the fourth grade.

The hearing officer framed the issue as follows:

> Should the School District be financially responsible for the parental placement of the student in a private school during the previous summer and the current school year?

Based upon the evidence and the controlling case law, hearing officer determined that the answer to the question posed was "No." The hearing officer determined that the fourth grade individualized education program ("IEP") developed by the District and accepted by the

Plaintiffs on January 14, 2005 for Joshua's third grade year provided Joshua with a Free Appropriate Public Education ("FAPE'). (Decision, p. 22) The hearing officer then determined that the IEP for the fourth grade, effective beginning September 2, 2005 and ending June 2, 2006, provides Joshua with a FAPE. (Decision, p. 23) Both the January 2005 IEP and the current IEP were developed to enable Joshua to make progress towards the goals and objectives agreed to by the parents and the District's IEP team members. The evidence presented at the due process hearing established that such progress was in fact made.[1]

Plaintiffs unilaterally decided to enroll Joshua at the Wolf School months before notifying the District and months before requesting and attending the September 2005 IEP meeting. At no point in the IEP process did Plaintiffs consider sending Joshua to the District for the fourth grade. Plaintiffs' decision was not made as a result of the allegedly deficient IEP proffered in September 2005, as no efforts were made by the Plaintiffs to obtain additional accommodations or supports from the District prior to deciding to enroll Joshua at the Wolf School. Furthermore, placement at the Wolf School does not comply with the District's legal obligation to provide the least restrictive environment for Joshua.

The evidence and testimony presented at the due process hearing amply supports the hearing officer's conclusion that the District provided FAPE to Joshua as required under the IDEA and that the District was not obligated to reimburse the Plaintiffs for the cost of his unilateral placement at The Wolf School.

---

[1] There is no testimony to support Plaintiff's statement that the implementation of the third grade IEP "aggravated his mental condition, to the extent that his ability to remain in school was seriously compromised." (Plaintiffs' Memorandum, p. 1) To the contrary, the evidence regarding Joshua's academic and social progress confirmed he was ready to be passed to the fourth grade. Moreover, Joshua was in a school setting while attending The Wolf School.

The District remains willing and able to provide Joshua with FAPE as outlined in the September IEP, with one-on-one paraprofessional support as needed to ease the transition back to the District and will engage in monthly consultations with an expert in Asperger's as recommended by the hearing officer.

## I. STANDARD OF REVIEW

Under the IDEA, even when a matter is being reviewed in the context of cross motions for summary judgment, the party challenging the outcome of the administrative decision bears the burden of proving that the educational agency erred. *Bristol Warren Regional Sch. Comm. v. Rhode Island Dept of Educ.*, 253 F.Supp. 2d 236, 240 (D.R.I. 2003).

In rendering her decision, the hearing officer based her analysis and conclusions upon the standard set forth by the United States Supreme Court in *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982) that FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." (Decision, p. 14)

The First Circuit has held that when reviewing the decision of a hearing officer, "the *Rowley* standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods." *L.T. v. Warwick School Committee*, 361 F. 3d 80, 83 (1st Cir. 2004). Consequently, the "district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an 'independent ruling based upon the preponderance of the evidence.'" *Id.* (citing to *Roland v. Concord School Committee*, 910 F.2d 983, 989 (1st Cir. 1982)) "That independence is tempered by the requirement that the court give 'due weight' to the hearing officer's findings. *Id.* This intermediate level of review reflects the concern that courts not substitute their own

notions of educational policy for that of the state agency, which has greater expertise in the educational arena." *Id.* In this context, the adequacy of an IEP is a mixed question of fact and law. *Id* at 84.

Here, the hearing officer carefully reviewed the modifications, accommodations and services in each of the IEPs, considered the credible and competent expert testimony, and determined that the IEP implemented by the District in the third grade and the the IEP proffered by the District for the fourth grade were reasonably calculated to provide FAPE to Joshua. (Decision, p. 15, 22-23)

The evidence presented by the Plaintiffs failed to establish that the District failed to meet its obligation to provide FAPE and further failed to establish that the unilateral placement at The Wolf School was appropriate by providing the least restrictive environment for Joshua's education. As the hearing officer observed, the witness from the Wolf School "could not provide current information about [Joshua's] academic and emotional progress beyond occasional encounters in the hallway at school." (Decision, p. 20)

The hearing officer did not ignore crucial evidence, as Plaintiffs contend, but refused to infer or supply evidence that was simply not before her. Quite pointedly, the hearing officer noted that neither of the experts who testified for the Plaintiffs had viewed the third or fourth grade classroom or met with any of Joshua's teachers or service providers. (Decision, p. 18, 20) Moreover, the hearing officer did not rely exclusively on Joshua's academic progress in concluding that FAPE was met, but considered his emotional and social progress as well.[2] (Decision, p. 16, n. 7, 17, 21)

---

[2] Plaintiffs' statement that the hearing officer "focused almost entirely on the fact that Joshua had thus far moved from grade to grade with passing marks" (Plaintiffs' Memorandum, p. 6) is quite simply, wrong.

Based on the totality of the evidence before her, the hearing officer concluded that "[Joshua] was a provided a FAPE in the third grade and was in the proper mainstream environment. The LEA program was designed to meet the 'unique' needs of the student." (Decision, p. 22)

From this point, the hearing officer reviewed the fourth grade IEP, focusing on the modifications and supports that had been added to account for the transition to a new school for the fourth grade and Joshua's other social issues. (Decision, p. 22, n.10) The hearing officer expressly found that paraprofessional support throughout the day was included in the IEP. (Decision, p. 22) Based on these facts, and the competent expert testimony of Dr. Meinhold, (Decision, p. 21), the hearing officer concluded that the fourth grade IEP would provide Joshua with FAPE. (Decision, p. 23)

The hearing officer considered the totality of the evidence before her, applied the controlling legal precedents to those facts, determined that the District had met its obligation to provide FAPE, and accordingly, denied the Plaintiffs' request for reimbursement of tuition at the private school for the current school year and the previous summer program. The decision of the hearing officer should be affirmed in all respects.

## II. LEGAL ANALYSIS

### A. Plaintiffs Have the Burden of Proof to Establish that the District Did Not Provide FAPE and that the Wolf School is an Appropriate Placement Under the IDEA.

The United States Supreme Court has recently confirmed that in cases where parents are seeking tuition reimbursement for a student unilaterally placed in a private school under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") the burden of proof lies with the parents at the administrative hearing level to establish that the IEP developed

by the District did not provide FAPE. *Schaffer v. Weast*, 126 S.Ct. 528 (Nov. 14, 2005). The Supreme Court held that under the IDEA, the party seeking relief through an impartial due process hearing bears the burden of proving that the District's IEP failed to provide FAPE. *Id* at 531, 537. Here, Plaintiffs have not presented any testimony that the District failed to provide FAPE to Joshua.

A claim for private school tuition reimbursement requires that the Plaintiffs' meet their burden of proof in establishing ***both*** that: (1) the public school placement under an IEP fails to provide FAPE, and (2) that the private school placement was appropriate under the IDEA. *Florence County School District No. 4 v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361 (1993).

Where, as here, there is no factual or legal basis to support the conclusion that the IEPs developed by the District for either the third or fourth grade failed to provide FAPE, private tuition reimbursement must be denied. As succinctly stated by the First Circuit Court of Appeals in *L.T. v. Warwick School Committee*, 361 F. 3d at 86, "Once the determination is made that the IEP was adequate, that ends the inquiry. We need not consider whether other programs would be better."

### B. The Hearing Officer Correctly Determined that the District Provided FAPE to Joshua in the Third Grade.

#### 1. The District Complied With the IDEA's Mandate to Provide Services that Conferred a "Meaningful Educational Benefit" to Joshua.

Pursuant to the United States Supreme Court decision in *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982), it is clear that "the IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated to provide an appropriate education as defined in federal and state law.'" *L.T. v. Warwick School Committee*, 361 F. 3d at 83 (citing to *Roland v. Concord School Committee*, 910

F.2d 983, 992-993 (1st Cir. 1982)). The "free and appropriate public education" requirement is satisfied if a state provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Education v. Rowley*, 458 U.S. at 203. Because Congress recognized in promulgating the law that "in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome," the substantive standard requires that the child be provided services to provide a "meaningful educational benefit." *Id* at 192. (citations omitted)

Thus, while the education and services provided "must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level..." regardless of cost. *Lenn v. Portland School Committee*, 998 F.2d 1083, 1086 (1st Cir. 1993). *See also Colin K. v. Schmidt*, 536 F.Supp. 1375, 1386 (D.R.I. 1982) *affirmed* 715 F.2d 1 (1st Cir. 1983) ("Whatever the precise definition of 'free and and appropriate public education' is, the term certainly does not mean the best education possible.")

In *Lenn v. Portland School Committee*, 998 F.2d at 1086, the First Circuit established the guiding principles under the IDEA as follows:

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

Despite Plaintiffs protestations to the contrary, these principles as set forth in the *Lenn* decision remain the guiding precedent in this Circuit.

The Supreme Court has directed that when a child has been educated in a regular classroom, academic progress is a significant barometer of whether FAPE under the IDEA has been met:

> When the "mainstreaming" preference of the Act has been met and a child is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child. Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain adequate knowledge of the course material. The grading and advancement system thus constitutes an important factor in determining educational benefit.

*Board of Education v. Rowley*, 458 U.S. at 202-203. As the First Circuit has iterated: "The issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." *Roland v. Concord School Committee*, 910 F.2d 983, 992-993 (1st Cir. 1982).

In this case, the third grade IEP provided academic benefits as well as related services to address Joshua's emotional and social needs in compliance with the IDEA and FAPE.[3] *Id* at 991. ("The key to the conundrum is that, while academic potential is one factor to be considered, those who formulate the IEP must also consider what, if any, 'related services,' 20 U.S.C. § 1401 (17), are required to address a student's needs.") The third grade IEP, as a package, reasonably targeted Joshua's special needs, both academic and non academic, as required by the IDEA. *Lenn v. Portland School Committee*, 998 F.2d at 1089-1090.

The third grade IEP specifically recognized Joshua's needs as including "emotional regulation (stress/anxiety, sensory); written output; social communication; expressive language; problem-solving and working efficiently (knowing when/how to take shortcuts, change plan); and homework independence. (Exhibit AB-1, p. 1) The District clearly acknowledged that

Joshua's educational needs extended beyond academic proficiency, including objectives in the IEP to improve non verbal social communications, his awareness and understanding of non-literal speech, improved use of conversational manners, behavior shaping to other students, and demonstrating appropriate responses to children and situations. (Exhibit AB-1, p. 4, 6) In order to serve these needs, the IEP specifically incorporated related services including one on one time with the special education teacher, occupational therapy, speech therapy and therapy with the school psychologist. (Exhibit AB-1, p. 10) It is significant that Plaintiffs have not challenged the scope or delivery of any of these related services.

The testimony at the hearing unequivocally established that progress was made on the majority of, if not all of, the goals and objectives outlined in the IEP. Education is a progression, and it would be manifestly unrealistic to expect all of the goals to have been met in the third grade. Rather, the law requires that the child experience meaningful educational benefit from the IEP as developed and implemented. This standard was clearly met by the third grade IEP.

The most reliable and credible testimony on this issue was given by the third grade special education teacher who worked with Joshua on a daily basis. Not only did she work with Joshua one on one each day, she also visited his regular classroom each day and observed him interacting with his classmates and peer models. Although she modestly did not refer to herself as such, Plaintiffs accepted her as an expert in the field of autism spectrum disorders and particularly, Asperger's, as she developed the model program in Rhode Island, the Rhode Island Autism Project. Her testimony was straightforward and unbiased. She clearly enjoyed working with Joshua and was consistently responsive to his emerging needs and social issues. While she

---

[3] In this regard, the present case is factually distinguishable from *Lamoine School Committee v. Ms. Z.*, 353 F.Supp. 2d 18 (D. Me. 2005) wherein the district failed to incorporate counseling services or other means to address the student's emotional, behavioral, and mental health issues. *Id* at 33.

readily conceded there were challenges in implementing the IEP, she affirmatively stated that Joshua was quite successful and could continue to be effectively educated in the District.

The special education teacher testified that Joshua had a supportive classroom environment and that he interacted very well in the classroom with many of the students and had one good friend. (Tr. Vol. III,p. 62) During his third grade year Joshua's writing skills improved, (Tr. Vol. I, 86), he was doing well academically and was doing his homework quickly so that he could work on other work and social skills during the half hour homework period with the special education teacher, (Tr. Vol. II, p. 201), he was doing well socially within his classroom and had a very warm support system of classmates in the regular classroom,(Tr. Vol. II. 201-202). Although Joshua was struggling somewhat emotionally, he was maintaining his composure within the classroom and during the school day. (Tr. Vol. II, p. 202) At the end of the third grade there were no red flags observed by the third grade special education teacher that there would be a problem with Joshua progressing to the fourth grade. (Tr. Vol. II, p. 234)

In short, by the end of third grade, Joshua was ready to progress to the fourth grade and his cognitive growth was significant. (Tr. Vol. II, p. 233) Accordingly, the District determined that Joshua would be passed to the fourth grade in the District and the Plaintiffs and the special education teacher agreed with this assessment. (Tr. Vol. I, p. 64; Vol. III, p. 31-32) In fact, Joshua is presently in the fourth grade at the Wolf School. No witness testified that it was not appropriate to promote Joshua to the fourth grade.

The conclusion that the third grade IEP provided FAPE to Joshua is also supported by reliable and credible expert testimony. Dr. Patricia Meinhold testified that in her expert opinion, the third grade IEP, as written and implemented, provided FAPE. (Tr. Vol. V, p. 89-90) Dr. Meinhold's professional experience includes assisting parents and school districts with

formulating IEP and she explained her familiarity with FAPE under the IDEA. (Tr. Vol. V, p. 63, 65-66) Before rendering her expert opinion, she reviewed the independent evaluations contained in the District's records, the testimony of the other witnesses, conducted an extensive interview with the third grade special education teacher and viewed her classroom environment. (Tr. Vol. V, p. 66-69, 86-87) Dr. Meinhold was particularly impressed by the flexible resources and responsiveness of the third grade special education teacher. (Tr. Vol. V, p. 70-71, 91-93)

After reviewing all of the relevant documentation and testimony regarding Joshua's educational, social and emotional needs, Dr. Meinhold candidly acknowledged that the IEP could have been better implemented in some circumstances, but nevertheless concluded that it provided FAPE to Joshua. (Tr. Vol. V, p. 89-90) Dr. Meinhold also agreed that Joshua could successfully transition to the fourth grade in the District. (Tr. Vol. V, p. 94-95)

Based upon the totality of the credible testimony, the hearing officer concluded that "Joshua was provided FAPE in the third grade and was in the proper mainstream environment. The LEA program was designed to meet the 'unique needs' of the student." (Decision, p. 22) This conclusion should be upheld in all respects.

**2. There Was No Credible Factual Basis Upon Which to Conclude that the District Did Not Provide FAPE for the Third Grade.**

**a. The School Incidents Related by the Plaintiffs Did Not Amount to a Failure to Provide FAPE.**

Plaintiffs introduced some evidence that the accommodations and modifications in the IEP may have not been consistently applied by the regular classroom teacher. However, these occasional inconsistencies in the implementation of modifications set forth in the IEP as related in Mrs. Beitle's June 15, 2005 letter do not constitute a sufficient basis to conclude that FAPE

was not met. *See L.C. v. Utah State Board of Education*, 125 Fed. Appx. 252 (10th Cir. 2005) (minor deviations in implementing IEP did not amount to failure to meet FAPE).

The special education teacher explained each of these events in the June 15 letter and the actions taken to resolve the issues in accordance with the IEP. (Tr. Vol. II, p. 177-190; 217-225) She was responsive to all of the parents' concerns, increased her time with Joshua and was flexible in her scheduling and in her approach to accommodate Joshua's issues on a particular day. (Tr. Vol. I, p. 62- 63; Vol. II, p. 177-190) The third grade special education teacher used these situations as teachable moments to assist the student with coping mechanisms as part of being integrated into the mainstream population. (Tr. Vol. II, p. 215)

The District does not deny that many of the incidents set forth in Plaintiffs' Memorandum with respect to the third grade occurred. However, the safety issues and playground incident as alleged in the letter are not relevant to the issue of whether East Greenwich provided Joshua FAPE. Plaintiffs can cite to no case that support this position. After the incident in the playground, every student was spoken to regarding social relations, the principal became involved and special education staff supervised the playground. (Tr. Vol. III, p. 59) Moreover, Dr. Hopkins recognized that the incident was typical of a third grade playground. (Tr. Vol. IV, p. 102) These purported incidents are simply not germane to whether the District met its obligations under IDEA and are not cognizable under the IDEA. In addition, no expert correlated these incidents with a failure to provide FAPE. As was undisputed from the testimony of both Mrs. Beitle and the third grade special education teacher, the special education teacher was responsive to every situation and made modifications and accommodations to meet his needs. It was likewise clear from the testimony that despite these glitches Joshua progressed academically as well as socially in the third grade.

It must be reiterated that no expert testified that these incidents amounted to a failure of the District to provide FAPE under the IDEA. The standard is not whether all of Joshua's needs were met by the District, but whether he received a meaningful educational benefit from the services provided by the District. In this regard, Dr. Meinhold testified that although the implementation could have been better, the requirements of FAPE were met for the third grade and would have been met by the fourth grade IEP. Simply put, since the Plaintiffs have failed to meet their burden of proof on this issue, their claim for private school tuition reimbursement must be denied. *Schaffer v. Weast*, 126 S.Ct. 528 (Nov. 14, 2005).

Pursuant to 34 C.F.R. 300.350, the District must "make a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the IEP." The District made more than a good faith effort in assisting Joshua to achieve a meaningful educational benefit in the third grade. The evidence at the hearing clearly established, and Mrs. Beitle readily testified, that the special education teacher was always responsive and did everything she could to assist Joshua in school. (Tr. Vol. I, p. 62- 63) Likewise, Plaintiffs had no complaints regarding the supportive services provided by the other members of the IEP team apart from the regular classroom teacher. This evidence, coupled with Joshua's demonstrated academic progress, supports the conclusion that the District complied with the IDEA's requirements and provided FAPE for the third grade.[4]

---

[4] Along these lines, the post implementation adjustments made periodically by the special education teacher are not inconsistent with the conclusion that FAPE was provided to Joshua. *Roland v. Concord School Committee*, 910 F.2d at 988, n. 2; *Kathleen H. v. Massachusetts Department of Education*, 154 F.3d 8 (1st Cir. 1998) (fact that district revised IEP between school years was not evidence that IEP for previous year was inadequate.)

**b. Joshua's Academic, Emotional and Social Progress Demonstrated that the District Provided Joshua with FAPE for the Third Grade.**

Even if this Court were to conclude that Joshua did not progress as far emotionally as he could have if the implementation of the third grade IEP was more consistent, this finding would not be sufficient to support a determination that the IEP failed to provide FAPE where it cannot be disputed that Joshua progressed in all other areas. See *Alexis v. Board of Education for Baltimore County Public Schools*, 286 F. Supp. 2d 551 (D. Md. 2003) (holding that a child's failure to improve in one area of his IEP for one half of a school year was insufficient to prove that child was deprived of FAPE under the IDEA).

Moreover, it is by no means clear that the anxiety experienced by Joshua was a direct result of his third grade experience. Dr. Hopkins' notes refer to a number of stressors that Joshua had, including his anxiety, depression, "unpredictable events at home", and the onset of Bell's Palsy. (Tr. Vol. IV, p. 69) Joshua had altercations with his brother at home that were a source of stress. (Tr. Vol. IV, p. 81) Each of these stressors existed throughout the third grade and was not caused by the District. Such difficulties continued after the third grade and were even present at the Wolf School during this past summer. Joshua had "unhappiness with [the] camp counselor and some camp rules. Some of his negativity may be part of a group dynamic…" (Tr. Vol. IV, p. 72) Joshua reported that he "hated" his summer school instructor. (Tr. Vol. IV, p. 73)

As Dr. Pearis testified, any event can be a source of stress, where there is sudden change, or too much stimulation. (Tr. Vol. II, p. 33) These stressors exist outside of the classroom and can include a trip to Disney World. (Tr. Vol. II, p. 32) Joshua also had stress at the Wolf School where he became "very upset about his teacher" describing her as "mean…" (Tr. Vol. II, p. 57).

Each of these instances manifests that Joshua difficulties were not tied to the third grade class but transcend all of his life experiences. This is not unexpected and the District should not be targeted for liability as it is not its responsibility under the IDEA to ensure that Joshua's emotional and social needs outside of the education setting are met in every respect.

### c. Plaintiffs Must Also Take Responsibility for Any Purported Shortfalls in the Implementation and Effectiveness of the Third Grade IEP.

During the third grade IEP process and throughout the course of its implementation, Plaintiffs failed to provide the District with the complete picture of Joshua's emotional diagnosis. It is inexplicable that the Joshua' parents did not inform the third grade special education instructor about the diagnosis of depression and the medication prescription for Prozac. No one provided the teacher or any school staff - including the school psychologist who saw the boy on a regular basis - with any of the records of treatments or summaries thereof. (Tr. Vol. IV, p. 67 - 68) It is improper for the Joshua's parents to conceal the extent of treatments, diagnoses, and updates on their son's condition and then turn to the District and claim that it did not do everything possible for him. The third grade special education teacher impressed everyone as a caring and knowledgeable professional on Asperger's who had Joshua's best interests at hand. This teacher made clear that she could have benefited from this type of medical information when caring for Joshua.

It is also inappropriate to single out the District for Joshua's claimed inability in making friends. Dr. Hopkins testified that Asperger's includes diagnostic criteria of "impairment in reciprocal social interaction and development of friends." (Tr. Vol. IV, p. 79) The disorder itself has as one of its conditions a problem in developing friends. Id. Hopkins observed this condition in Joshua. (Tr. Vol. IV, p. 80) The third grade special education teacher also testified

that based upon her extensive experience with children with Asperger's in the school setting, said children would tend to have a negative perception of social experiences, struggle with relationships, overreact to other students and more miscommunication tends to occur. (Tr. Vol. III, p. 83) Dr. Hopkins also acknowledged Joshua's tendency to perceive things in a negative manner. (Tr. Vol. IV, p. 40) Nevertheless, the third grade special education teacher witnessed Joshua interacting with a number of students, who were described as caring. Based on the totality of the evidence, it must be concluded that the Joshua's inability or perceived inability to make friends did not equate with a failure to provide FAPE under the IEP.

### C. The Hearing Officer Properly Concluded that the District Provided FAPE to Joshua for the Fourth Grade.

#### 1. The Facts and Expert Testimony Established that the IEP for the Fourth Grade Provided FAPE.

The legal standards outlined in the preceding sections are equally applicable to the determination of whether the fourth grade IEP would have provided FAPE, and lead to the same conclusion; namely that the District offered Plaintiffs an IEP that would have provided FAPE to Joshua for the fourth grade.

The fourth grade IEP team gathered information from the third grade IEP team in order to formulate and implement an appropriate IEP for the fourth grade. (Tr. IV, 164-165). The fourth grade IEP team also reviewed all of the previous evaluations performed by various professionals regarding Joshua's educational disabilities in accordance with the IDEA. *T.B. v. Warwick School Department*, 2003 WL 22069432, *12-13 (D.R.I. 2003) affirmed 361 F.3d 80 (1st Cir. 2004). Also, two members of the fourth grade IEP team, the special education teacher and the school psychologist had observed Joshua in the third grade setting. (Tr. Vol. V, p. 6-7, 19)

The testimony from the fourth grade IEP team, and particularly the regular education teacher, elaborated on the structural and organization supports that would be placed in the regular classroom for Joshua, as well as the regular education students. (Tr. Vol. IV, p. 151-159; Exhibit AB-2.) The regular education teacher had considerable experience and success with students diagnosed with Asperger's and students on the autism spectrum with autistic tendencies. (Tr. Vol. IV, p. 151) Similarly, the speech pathologist, with education and experience in autism and Asperger's, testified that social language supports and services would be provided for Joshua at the fourth grade school.[5] (Tr. Vol. IV, p. 173-180, 190-193) Moreover, Joan Souza, principal of the fourth grade school testified that there was a mechanism in place to address any noise or sensitivity issues once Joshua joined the school environment. (Tr. Vol. V, p. 23, 40) As Ms. Souza testified the IEP was intended as a flexible, working, document:

> Even though I don't see an actual plan regarding his leaving the classroom, I do see that opportunity to work and set aside space is embedded within this particular document and, you know, having the paraprofessional support there should that time have--have come to fruition, then we had, we felt we had supports in place and should we have needed to develop an alternate plan, we, because of our diligence in meeting and co-teaching and meeting on a weekly basis for collaborative purposes, we felt as though that would be addressed."

(Tr. Vol. V, p. 35)

Currently there are six students at the fourth grade school receiving services under an IEP. (Tr. Vol. IV, p. 208-210) The District's record of success in helping autistic children and children with Asperger's supports the conclusion that the fourth grade IEP would confer a meaningful educational benefit upon Joshua.

One member of the September 2, 2005 IEP team specifically recalled that at the end of the IEP meeting, the parents and their counsel stated that they did not have a problem with the

---

[5] Ms. Osier was available at the fourth grade school four days a week (Tr. Vol. IV, p. 171). In addition a special education classroom setting would have been made available to Joshua had he attended the fourth grade school in

IEP and that the IEP seemed appropriate, but that they had reservations and lacked confidence or trust in the school department. (Tr. Vol. IV, p. 142-143) Plaintiffs did not request that Joshua be assigned a dedicated one-on-one paraprofessional. (Tr. Vol. V, p. 168; Affidavit of Joan Souza) Although the testimony on this issue was conflicting, it is apparent that this issue was not critical to the Plaintiffs for at least two reasons: (1) they had expressly stated that they did not want Joshua to be singled out, (Exhibit AB-2, p. 1; Tr. Vol. V, p. 42); and (2) the Wolf School does not provide one-on -one paraprofessional support. (Tr. Vol. II, p. 130-131) Moreover, the principal of the fourth grade school testified that the IEP was flexible and that if it became apparent that Joshua needed greater support it would have been provided to him. (Tr. Vol. V, p. 33, 35)

Significantly, despite the fact that Joshua had been seeing Dr. Hopkins for nearly a year, the parents did not request that she attend the September 2, 2005 IEP meeting. (Tr. Vol. V, p. 40-41) Nevertheless, all of the requests proposed by the parents at the September 2005 IEP meeting were implemented and included in the IEP. (Tr. Vol. V, p. 41) At the September 2, 2005 meeting, neither of the parents objected to Joshua being placed in a regular education setting. (Tr. Vol. V, p. 42)

Dr. Meinhold's expert testimony confirmed that the fourth grade IEP provide FAPE to Joshua. (Tr. Vol. V, p. 100-101) Her starting point was the third grade IEP and opinions she had formulated in her own mind regarding modifications to make it a "better IEP". (Tr. Vol. V, p. 95-96) Dr. Meinhold stated that the additional supportive services she would have recommended were included in the fourth grade IEP. (Tr. Vol. V, p. 96) Dr. Meinhold met with the entire fourth grade IEP team and was impressed with the fact that they worked as a well integrated team and provided consistent supports to each other. (Tr. Vol. V, p. 96-99) Based upon all of

---

the district.. (Tr. Vol. IV, p. 192-193)

this information, and her professional experience, Dr. Meinhold unequivocally opined that overall the fourth grade IEP "really was hitting the mark." (Tr. Vol. V, p. 101)

Moreover, the hearing officer specifically noted the additional modifications and accommodations in the fourth grade IEP, as well as the presence of paraprofessional support throughout the school day, that were made by the fourth grade IEP team to address Joshua's academic, emotional and social needs. (Decision, p. 22) Based on all of the credible evidence before her, the hearing officer concluded that the fourth grade IEP complied with the District's obligation to provide FAPE. (Decision, p. 23)

### 2. No Relevant Countervailing Evidence or Testimony Established that the Fourth Grade IEP Did Not Provide FAPE.

Plaintiffs produced witnesses to testify regarding the perceived benefits of the Wolf School and Joshua's improvements in the fourth grade. Leaving aside the question of whether those improvements were as a result of medication, maturity, or the social skills programs over the summer (which was run by Lore Gray, the Joshua's third grade special education teacher), and whether those improvements would have been achieved in the fourth grade classroom in the District, the fact remains that credentials of the Wolf School and the student's progress at the Wolf School are not relevant or material to the determination of whether or not the District provided FAPE. *See L.C. v. Utah State Board of Education*, 125 Fed. Appx. 252 (10th Cir. 2005) ("Success at a private institution is not probative of whether the public school provided a FAPE."); *A.I. v. District of Columbia*, 2005 WL 3274479 (D.D.C. 2005) (holding that analysis of the appropriateness of a public school placement is not comparative and it would be irrelevant and improper to engage in a comparison of performance at the public school versus the private school.)

**D. Plaintiffs Did Not Present Reliable Expert Testimony to Support a Conclusion that the District Did Not Provide FAPE for the Third Grade or Fourth Grade.**

Plaintiffs introduced two expert witnesses, Dr. Jessica Hopkins and Dr. Gillian Pearis, who have very good credentials but were not capable of testifying on the relevant issues in dispute.

Dr. Hopkins readily admitted that she did nothing to familiarize herself with the third and fourth grade classes at the District's schools beyond the reporting by the student, Joshua. (Tr. Vol. IV, p. 55, 57, 87) This method of gathering information for expert testimony is deficient and indeed, it is completely unacceptable when considering Dr. Hopkins' own assessment on Joshua's ability to accurately report information. Dr. Hopkins' testified that Joshua suffered from depression, and exhibited "negative style of thinking that he had, everything is wrong, everything is terrible, nothing is going to work." (Tr. Vol. IV, p. 61) Dr. Hopkins' notes indicate that Joshua lied on recent occasions giving inaccurate information about his experience at school. (Tr. Vol. IV, p. 118) It is inexplicable that Plaintiffs could submit testimony from Dr. Hopkins on the District's program when the doctor relied so heavily on a source of information that was concededly incapable of accurate reporting. Given the "negative style of thinking," it was a foregone conclusion that Dr. Hopkins would find problems with the District's classes. Her error is compounded by the fact that Plaintiffs concede that the third grade special education teacher is an expert in the field of Asperger's. Despite such acknowledgment, Dr. Hopkins had only one discussion with the special education teacher, and no discussions with any other person who worked with Joshua in the third grade. (Tr. Vol. IV, p. 67)

Dr. Hopkins did not even visit the third grade regular classroom or special education room. (Tr. Vol. IV, p. 84) She did not know the profile of the other students in his third grade.

(Tr. Vol. IV, p. 86) The same is true with respect to the fourth grade setting. (Tr. Vol. IV, p. 116-117) With respect to the Wolf School, Dr. Hopkins spent literally hours in a number of classrooms observing the children and the staff. (Tr. Vol. IV, p. 56, 63)

In the doctor's own recommendations, she states that "there be regular consultation between related therapists and the teaching staff." (Tr. Vol. IV, p. 6) Yet, this doctor did nothing to achieve her own recommended objective. (Tr. Vol. IV, p. 6) The testimony on this issue reveals a doctor who is trying to explain away the fact that she never contacted the teachers. (Tr. Vol. IV, p. 97-100) She gives various explanations, including her assessment that the third grade special education teacher was so qualified. (Tr. Vol. IV, p. 98) However, she finally admitted that "ordinarily I often have more contact with school staff..." (Tr. Vol. IV, p. 98) Her findings simply are not first hand and are not supported by an appropriate objective source. As such they were properly discounted by the hearing officer.

Dr. Pearis was likewise deficient with respect to any opinion that she could offer to the hearing officer as she did not have a history of the boy's depression prior to the date that she first saw him. (Tr. Vol. II, p. 73-74) The possible existence of distymia may make the student more susceptible to episodes of depression. (Tr. Vol. II, p. 72-74) Of course, it is impossible to identify the District as the source of Joshua's difficulties when the treating psychiatrist cannot even explain the psychiatric history of the student. What is clear from her notes is that Joshua had improved during and by the end of the third grade school year to the point where the psychiatrist was weaning him off of Prozac: "by the summer he was feeling good. Usually we like to treat depression -- depression for a year. ...We have sort of shortened that because during the summer he was feeling so much better ..." (Tr. Vol. II, p. 78) The doctor's records indicate that by March, 2005, Joshua was much less depressed. (Tr. Vol. II, p. 50)

The doctor was also deficient in her assessment of the District's classes since she only relied upon what was reported to her by Joshua and his parents. (Tr. Vol. II, p. 36) Before rendering her testimony to the hearing officer, Dr. Pearis did not go to the District to view the student's school environment. (Tr. Vol. II, p. 35) When specifically asked about the basis for her opinion, Dr. Pearis testified:

> Q. So the opinions that you shared today -- are they -- were they done in the absence of actually coming to the third grade in which he was at the time that you saw him?
>
> A. Yes.
>
> ....
>
> Q. And in rendering your opinions today, did you actually meet or speak with any of the special education teachers that were assigned to [Joshua] for his third grade?
>
> A. No, I did not.

(Tr. Vol. II, p. 35-36)

When discussing the class size of the third grade, the psychiatrist ultimately conceded that she had no knowledge concerning the special education teacher [who was conceded to be an expert], or the aides who were assigned to work with him. (Tr. Vol. II, p. 81) The flaws in the doctor's testimony is emphasized in the following exchange:

> Q. So your opinion that you have shared with us today regarding the size [of the class], that is not done with the aid of knowing actually what the East Greenwich School System provided to [Joshua] with respect to his third grade experience?
>
> A. not specifically, not specifically. ....

(Tr. Vol. II, p. 81) Dr. Pearis did not even know that an IEP had been prepared for Joshua in September of 2005 for his fourth grade with the District. (Tr. Vol. II, p. 82)

> Q. So any opinions you've provided today were in the absence of knowing what the East Greenwich School System was planning on providing to [Joshua] at the Hanaford School for his fourth grade, is that right?

A. That's correct.

(Tr. Vol. II, p. 83)

Dr. Pearis conceded that given the student's depression, his reporting could be more negative than might actually be the case. (Tr. Vol. II, p. 36 - 37) In fact, Dr. Pearis acknowledged that it would have been helpful to better assess what the student's conditions were that were causing his stress to actually see the environment that he is on a day-to-day basis. (Tr. Vol. II, p. 37 - 38)

The hearing officer's observations as to the weight given to the expert testimony in this case were right on target:

> Of the four experts who testified, only two were familiar with the LEA [the District's] program. The third-grade special education teacher provided careful attention to [Joshua]; he progressed academically and made emotional adjustments at school. There were problems that came up from time to time, but they were handled promptly and teaching strategies were changed when necessary. The pediatric psychologist employed by the LEA to review all of [Joshua's] records and to interview his third grade service providers concurred.

(Decision, p. 21)

Plaintiffs have proffered no legal or factual basis to reverse the hearing officer's factual findings that the District's complied with its obligation to provide FAPE to Joshua in the third and fourth grade.[6]

### E. Plaintiffs Did Not Satisfy Their Burden of Proving that the Wolf School Provided the Least Restrictive Environment for Joshua.

Because the hearing officer determined the District provided FAPE to Joshua for the third and fourth grades, she did not specifically determine whether the Wolf School was an

---

[6] The District submits that the testimony pertaining to the years prior to the third grade are irrelevant to the determination of whether the District provided FAPE for the third and forth grade and should not be considered by this court. Moreover, Mrs. Beitle's testimony regarding Joshua's experience from kindergarten through the second grade consisted largely of hearsay, unsupported by independent witnesses or documentary evidence. To the extent there were clinical evaluations they were unclear as to his diagnosis and educational needs.

appropriate placement. However, should this Court determine that the District did not provide FAPE, which the District asserts would be against the weight of the evidence and the controlling case law under the IDEA, Plaintiffs would nevertheless have the burden of proving that the Wolf School was an appropriate placement in order to obtain reimbursement for their unilateral decision to transfer Joshua out of the District. *Florence County School District No. 4 v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361 (1993).

The IDEA requires the states to educate disabled students in the "least restrictive environment," and mandates that each disabled child be educated with non-disabled children to the maximum extent possible. 20 U.S.C. § 1412 (a)(5)(A). *T.B. v. Warwick School Department*, 2003 WL 22069432, *5 (D.R.I. 2003) affirmed 361 F.3d 80 (1st Cir. 2004). "[W]hen the bias in favor of mainstreaming is married to concepts of appropriateness and adequacy, it becomes apparent that an IEP which places a pupil in a regular public school program will ordinarily past academic muster as long as it is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Lenn v. Portland School Committee*, 998 F.2d at 1086 (citing to *Rowley*, 458 U.S. at 204).

In this regard, the special education teacher testified that it was important for Joshua to be in a mainstream classroom so that he could learn to cope in a regular environment with non special needs students. (Tr. Vol. III, p. 50) Because he was able to keep up with the mainstream curriculum, he was not in need of one-to-one instruction. (Tr. Vol. III, p. 50) Dr. Meinhold confirmed this assessment, explaining the benefits of a least restrictive environment in the regular classroom setting. (Tr. Vol. V, 101-103) With respect to Joshua specifically, Dr. Meinhold stated: "I think in his case because he's so sophisticated and close to his peers, he is so intellectually gifted, there's every reason to put those things together and use a regular education

setting as a place to bring him along--and let him learn in a more typical setting with the supports he needs." (Tr. Vol. V, p. 104) She further explained Joshua's need for peer models for his social development. (Tr. Vol. V, p. 109-111) Dr. Meinhold also opined that the Wolf School was more restrictive than necessary, as there were other supports available to be "ramped up" in the public school setting if needed. (Tr. Vol. V, p. 105-106) Dr. Meinhold testified that Joshua could spend at least eighty percent of his time in a regular education setting, which approximates what was proposed for the fourth grade. (Tr. Vol. V, p. 107-108)

There is no credible contradictory expert testimony. Plaintiffs' expert Dr. Hopkins conceded that Joshua could be educated in a public school setting with appropriate staff and training. (Tr. Vol. IV, p. 60) Dr. Hopkins also agreed that a child should have as much integration into a regular classroom setting as that child could benefit from. (Tr. Vol. IV, p. 94)

Dr. Hopkins' contradictory opinions in this regard are fatally flawed since she contended that Joshua needs to be placed in a self-contained setting, rather than an integrated setting. (Tr. Vol. IV, p. 88) No evidence was proffered by Plaintiffs that would support such a position. By all accounts, Joshua progressed academically in the third grade and everyone agreed that he should pass on to the fourth grade. The third grade special education teacher presented compelling testimony as to Joshua's overall progress, both academically and emotionally, in third grade. This is not a boy who is so impaired that he requires removal from a regular education setting. Dr. Hopkins supported Joshua's integration in third grade. Indeed, Dr. Hopkins testified that Joshua would benefit from after-school activities such as Boy Scouts, school clubs and sports, such as martial arts. (Tr. Vol. IV, p. 93) To support integration in such activities as the Boy Scouts, and then claim that Joshua needs to be isolated from that same

population of children in the school setting is self-contradictory and designed solely to support the Plaintiffs' unilateral removal of Joshua from the District.

Both the third grade IEP team (Tr. Vol. II, p. 191-192; 249-250), and the fourth grade IEP team, (Tr. Vol. IV, p. 230; Vol. V, p. 15-16), had specific training in autism and Asperger's.[7] The record does not establish that similar training was provided to the instructors at the Wolf School. (Tr. Vol. II, p. 144-145)

Furthermore, the law recognizes that the "correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities. *Roland v. Concord School Committee*, 910 F.2d at 993. It is completely erroneous to ignore the mainstreaming requirement. *Id. See also Rome School Committee v. Mrs. B*, 247 F.3d 29, 33 (1st Cir. 2001) ("Mainstreaming cannot be ignored, even to fulfill substantive educational criteria.") Where, as here, the student thrived academically and in other areas in the mainstream experience, and the District has testified regarding its willingness to provide any further help needed in the fourth grade, private placement in a more restrictive environment is inappropriate and not reimbursable. *Kathleen H. v. Massachusetts Department of Education*, 154 F.3d 8 (1st Cir. 1998). *See also A.B. v. Lawson*, 354 F.3d 315, 330-331 (4th Cir. 2004) (private placement of child in special education school with students of above-average intelligence did not comply with the least restrictive environment mandate of the IDEA).

It is undisputed that the Wolf School does not provide a mainstreamed learning environment and does not include regular education students. It likewise cannot be disputed that Joshua experienced an educational benefit from being in a regular classroom in the District, as evidenced by his progression to the fourth grade and the testimony of his third grade special

education teacher. Thus, it cannot be concluded that the Wolf School provides the least restrictive environment for Joshua as mandated by the IDEA.

To the extent Plaintiffs' argue that their perceived shortfalls in the IEPs proffered by the District is sufficient to justify a change in placement based upon *Greenbush School Committee v. Mr. and Mrs. K*, 949 F.Supp. 934 (D. Me. 1996), the present case is readily distinguishable. In *Greenbush*, there was evidentiary support for a finding that the parents had hostility toward the school committee and teachers at the public school, that the student was harassed by classmates, teachers and administrators, and the student testified regarding his debilitating fear of returning to the school. No such testimony was adduced in this case. Moreover, *Greenbush* was not a private tuition reimbursement case, as the requested new placement was another public school and the only issue being addressed was transportation.

Finally, the Wolf School is not the appropriate placement for Joshua because there is a range of placements available within the District. Plaintiffs have asserted that the Wolf School is the only appropriate placement for Joshua. However, even their own expert, Dr. Hopkins, acknowledged that a child such as Joshua could be educated in the District with appropriate supports. This opinion was confirmed by the District's expert, Dr. Meinhold, who testified that based upon her review of the fourth grade IEP, her interviews with the various school educators and service providers, and the fact that the District had available resources to provide additional paraprofessional support as needed, the District could provide FAPE to Joshua. (Tr. Vol. V, p. 96-101) Moreover, in this regard, Ms. Souza testified that the fourth grade IEP team remained flexible to make adjustments to Joshua's IEP as the need arose, once he began attending the school. (Tr. Vol. V, p. 35)

---

[7] Plaintiffs' bald conclusion that the third grade issues arose "because the teachers did not receive appropriate instruction regarding Joshua's special needs" (Plaintiffs' Memorandum, p. 8) is simply not supported by the

Neither the hearing officer nor this Court can ignore the IDEA mandate to consider the least restrictive environment in which Joshua can receive FAPE. *T.B. v. Warwick School Department*, 2003 WL 22069432, *5 (D.R.I. 2003) affirmed 361 F.3d 80 (1st Cir. 2004). There is a range of options available in the District before a private placement would be appropriate. Here, there can be no dispute that the Wolf School is not the least restrictive environment, and credible and reliable evidence established that Joshua could receive FAPE within the District. Accordingly, the hearing officer's denial of Plaintiffs' claim for tuition reimbursement for their unilateral decision to place Joshua at the Wolf School and remove him from the District must be affirmed.

## III. REMEDY

### A. Plaintiffs Are Not Entitled Reimbursement for Tuition Paid to the Wolf School for the 2005-2006 School Year.

It is well established that parents who unilaterally choose to educate their child at a private school, while challenging a proposed IEP, without the consent of state or local school officials, do so at their own financial risk. *Florence County School District No. 4 v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361 (1993) (citing to *Burlington v. Dept of Education for the Commonwealth of Massachusetts*, 471 U.S. 359, 373-374, 105 S.Ct. 1996 (1985)). *See also Greenland School District v. Amy N.*, 358 F. 3d 150 (1st Cir. 2004) (discussing 1997 amendments to IDEA and limitations on reimbursement for unilateral private school placement.)

As set forth herein, Plaintiffs have not met their burden of proving that the District failed to provide FAPE or that the Wolf School was an appropriate placement under the IDEA. Consequently, Plaintiffs' request for tuition reimbursement must be denied. *See L.T. v. Warwick School Committee*, 361 F. 3d 80, 86 (1st Cir. 2004); *Roland v. Concord School Committee*, 910

---

record.

F.2d 983, 992-993 (1st Cir. 1982). *See also Mr. and Mrs. I v. Maine School Administrative District*, 416 F.Supp. 2d 147, 170-171 (D. Me. 2006) (denying reimbursement where the parents failed to establish the appropriateness of the private school placement).

Likewise, Plaintiffs' request for reimbursement cannot be recast as a claim for compensatory education. *Ms. M v. Portland School Committee*, 360 F.3d 267, 273-274 (1st Cir. 2004) (holding that the term "compensatory education" does not encompass tuition reimbursement); *Mr. and Mrs. I v. Maine School Administrative District*, 416 F.Supp. 2d at 172-173 (denying reimbursement claim recast as claim for compensatory services.) Plaintiffs are not entitled to an award of compensatory services because they were not sought as part of their request for a due process hearing or in the context of the hearing itself.

More importantly, no expert testimony was offered to establish that any of the services presently being provided to Joshua, either in the summer camps, by Dr. Pearis or by Dr. Hopkins, were in the nature of compensatory services necessitated by the District's alleged failure to implement the third grade IEP or to provide FAPE for the fourth grade. To the contrary, Joshua had gone to camps the previous summer after the second grade, which is not at issue in this case, and was being treated by the Dr. Pearis before the IEP was developed and has continued on medication during Joshua's tenure at the Wolf School. Likewise, Dr. Hopkins was treating Joshua for his anxiety, depression and other symptoms of Asperger's which pertained to his family, home life and social life, not limited to or specific to his school situation, and continues to treat Joshua. In addition, there was no testimony, expert or otherwise, that the attendance at the Wolf School was intended as a compensatory service for the District's alleged IEP failures.

Plaintiffs have sought tuition reimbursement only, which, based upon the legal precedents set forth herein, simply cannot be awarded under the facts and circumstances of this case.

**B. Plaintiffs Are Not Entitled to Reimbursement for the Summer Program at the Wolf School.**

The District is not obligated to reimburse the Plaintiffs for the cost of the summer program because there was no evidence introduced at the hearing to establish that Joshua needed extended school services or that the summer program at the Wolf School was intended to serve as an extended school year program.

The special education teacher in the third grade testified that she did not recommend or consider Joshua for extended school year services (ESY) because he did not meet the criteria. (Tr. Vol. II, p. 31) She explained that ESY was only for students that exhibited signs that they would regress academically or could not make up learning that may have been lost over the summer within the first quarter of school. (Tr. Vol. III, p. 31) In fact, Joshua attended two camps over the summer which were primarily social and not academic in nature.

Moreover, there was no evidence that Joshua regressed academically over the course of the summer or was otherwise behind after the first quarter at the Wolf School.

Since there was no testimony, expert or otherwise, that Joshua required ESY between his third and fourth grade year, and that he would have regressed had he not attended the summer camp at the Wolf School, there is no legal or factual basis to conclude that ESY should have been provided. Likewise, there is no testimony that Joshua attended either of the camps based on recommendations from his treating psychologist or a perceived need for compensatory education. Consequently, the District cannot be required to reimburse Plaintiffs for the cost of the summer camps attended by Joshua.

## CONCLUSION

For the reasons set forth herein, the Decision of the hearing officer should be affirmed in all respects and Plaintiffs' claims against the East Greenwich School Committee should be denied in all respects.

EAST GREENWICH SCHOOL COMMITTEE,

By their Attorneys,

Christine M. Curley (RM)

Raymond A. Marcaccio, Esquire (#3569)
Christine M. Curley, Esquire (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax

## CERTIFICATION

I hereby certify that a true copy of the foregoing Memorandum in Support of Defendant's Motion for Summary Judgment was mailed, regular mail, postage prepaid, to Mary Ann Carroll, The Law Offices of Stephen M. Robinson, 155 South Main Street, Suite 402 Providence, RI 02903 on the 14th day of July, 2006.