UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID BEITLE and JULIE BEITLE<br>as parents and next friends of JOSHUA BEITLE<br>*Plaintiffs* | : | |
| v. | : | C.A. No. C.A. 06-02 |
| EAST GREENWICH SCHOOL COMMITTEE<br>*Defendant* | : | |

**DEFENDANT'S STATEMENT OF FACTS**

Now comes the Defendant, the East Greenwich School Committee, and hereby submits its statement of facts in support of its motion for summary judgment.

1. Joshua Beitle entered the East Greenwich Public Schools (hereinafter the "District") for kindergarten in 2001. (Transcript, Volume I, p. 9) (hereinafter "Tr. Vol.")

2. Joshua was passed to and attended first grade in the District. (Tr. Vol. I, p. 13)

3. The District monitored Joshua in reading since he began receiving services from a reading specialist two or three times a week in the first grade. (Tr. Vol. I, p. 13-14; Exhibit A-5)

4. Joshua was passed to and attended second grade in the District. (Tr. Vol. I, p. 17)

5. No direct testimony was adduced from school personnel regarding Joshua's conduct within the school setting during the kindergarten or first grade. (Decision p. 4)

6. The District held an eligibility evaluation meeting in June 2004, at the end of Joshua's second grade year. (Tr. Vol. I, p. 22) At the time of the June 2004 meeting, the District had received evaluations from HearCare Rhode Island, (Exhibit A-1), an Occupational Therapy Evaluation, (Exhibit A-2) and an evaluation from the Child Development Center at Rhode Island Hospital (Exhibit A-3). (Tr. Vol. I, p. 16-22) Each of these evaluations contained differing conclusions regarding Joshua's diagnoses and needs. None of these evaluations diagnosed

Joshua as suffering from Asperger's Syndrome. As a result, the District determined that further testing was necessary to determine eligibility under IDEA and Joshua's requirements in terms of modifications, accommodations and supportive services.

7. Based upon his parent's unilateral decision, Joshua attended the Wolf School for a three week summer camp between the second and third grade. (Tr. Vol. I, p. 97) No one at the Wolf School diagnosed John with autism or suggested that he might be autistic. (Tr. Vol. I, p. 97)

8. A the beginning of Joshua's third grade year, the District conducted a Reading Evaluation on September 13, 2004 (Exhibit A-5) and an Educational Evaluation on September 22, 2004. (Exhibit A-6)

9. On October 26, 2004, the District received a copy of a letter sent to the parents of Joshua on September 13, 2004, from a psychologist who had been treating Joshua for several months. (Exhibit A-4) Prior to this time, the parents had not transmitted the psychologist's records to the District. (Tr. Vol. I, p. 66). This letter contained a suggestion that Joshua should be evaluated for Asperger's Syndrome, as the psychologist could not make a conclusive diagnosis. (Exhibit A-4)

10. Joshua was evaluated by the Neuro Development Center on several dates in October and November 2004. (Exhibit A-7) A Diagnostic Evaluation was received by the District on December 21, 2004. (Exhibit A-7)[1] This report contains the first diagnosis of Asperger's Syndrome. (Tr. Vol. I, p. 67)

11. After the District received this evaluation, it determined that Joshua was eligible for services under the IDEA. (Tr. Vol. I, p. 35)

12. Before the IEP was written, with the Plaintiffs' permission, the third grade special education teacher observed Joshua and made physical modifications to the classroom, including changing the lights, putting felt tips on the chairs and asking the teacher to turn off the computer and air purifier, in order to reduce the noise level and sensitivity of Joshua's classroom environment. (Tr. Vol. II, p. 243-244)

13. After receiving the Asperger's diagnosis, the District convened an IEP team meeting and developed an IEP with effective dates from January 7, 2005 through January 7, 2006. (Exhibit AB-1; Tr. Vol. I, p. 79)

14. Plaintiffs' signed and accepted the IEP as written. (Exhibit AB-1; Tr. Vol. I, p. 53-54)

15. Plaintiffs' agreed in January 2005 that a self contained environment was not an appropriate placement for Joshua. (Tr. Vol. I, p. 63-64)

16. The IEP incorporated many of the recommendations set forth in the Diagnostic Evaluation prepared by psychologist Dr. Jessica Hopkins. (Exhibit AB-1; Exhibit A-7)

17. The special education teacher who worked with Joshua in the third grade, has extensive experience working with children within the autism spectrum, started the Rhode Island Autism Project and is regarded as an expert in the field of special education of autistic children. (Tr. Vol. II, p. 101-107)

18. The special education teacher discussed the January IEP with Dr. Hopkins, the psychologist who prepared the Diagnostic Evaluation and who had been treating Joshua since that time. (Tr. Vol. II, p. 199-200) Dr. Hopkins agreed that the IEP incorporated her recommendations and could meet Joshua's needs. (Tr. Vol. IV, p. 37; Vol. IV, p. 83)

---

[1] The first page of the Diagnostic Evaluation in the District's records is dated stamped as received on December 21, 2004. At the hearing, Mrs. Beitle recalled that the report was probably given to the District some time in December.

19. Both Dr. Hopkins and the special education teacher at the District assessed Joshua as high functioning. (Tr. Vol. I, p. 100)

20. Since December 7, 2004, Joshua was prescribed Prozac by Dr. Gillian Pearis to treat his depression and anxiety. (Exhibit A-9) Dr. Pearis did not communicate with the District or Joshua's special education teacher regarding his treatment or medication. (Tr. Vol. II, p. 55)

21. After the January IEP was in place, Mrs. Beitle communicated with Joshua's special education teacher at least three times a week. (Tr. Vol. I, p. 39) Mrs. Beitle did not inform the special education teacher that Joshua was taking Prozac for his depression and anxiety or that he had been diagnosed by Dr. Pearis with Generalized Anxiety Disorder and Generalized Depressive Disorder. (Tr. Vol. II, p. 242, Vol. III, p. 43-44) Because the special education teacher did not have Dr. Pearis' medical records, she was not aware of the degree of his depression. (Tr. Vol. III, p. 41-42; 87)

22. Mrs. Beitle did not summarize or share with the special education teacher the psychiatric treatments or counseling that Joshua was receiving during the school year. (Tr. Vol. III, p. 44-45; 78)

23. Lore Gray testified that the information regarding Joshua's outside psychological and medical treatments would have assisted the District and her in developing more emotional training sooner and that the IEP team could have convened to discuss additional services. (Tr. Vol. III, p. 41-42)

24. Every time Mrs. Beitle communicated with the special education teacher she was responsive to any issues raised by her and consistently sought to implement solutions and increased the amount of time she spent with Joshua. (Tr. Vol. I, p. 62- 63)

---

(Tr. Vol. I, p. 69)

25. Mrs. Beitle talked more with the special education teacher than the regular education teacher regarding issues in the regular education classroom, despite volunteering in the regular education classroom on a weekly basis. (Tr. Vol. I, p. 61)

26. In her role as case manager, the special education teacher educated the rest of the IEP team regarding Joshua's needs and worked consistently with staff to implement his IEP. (Tr. Vol. II, p. 110-111; 175-176) The special education staff at the third grade school was trained in dealing with autism and autism spectrum disorder. (Tr. Vol. III, p. 28-30)

27. The third grade IEP was modified by the special education teacher during the course of the school year to provide additional emotional and social supports for Joshua. (Tr. Vol. III, 33-35)

28. The special education teacher had four teaching assistants to help her supervise and assist students with IEPs who were all trained to address students with autism. (Tr. Vol. II, p. 191-192; 249-250) From January 2005 through June 2005, there were four adults available to serve six students with IEPs. (Tr. Vol. II, p. 227-228)

29. The special education teacher worked with Joshua every day on homework and her classroom was available for Joshua to go to as a safe haven whenever he felt stress or anxiety in the regular classroom. (Tr. Vol. II, p. 110, Vol. III, p. 64; 79-80)

30. An IEP status meeting was held with the Plaintiffs and the third grade IEP team in May 2005 to review and address issues that had arisen since the initial IEP was developed. (Tr. Vol. I, p. 45-46) There is no evidence that Plaintiffs asked for extended school year services at this time.

31. Lore Gray testified that Joshua was not recommended for extended school year services because it was not necessary and because he did not meet the state qualifications,

namely that without extended school year services he would regress academically over the summer. (Tr. Vol. III, p. 31)

32. Mrs. Beitle's June 15, 2005 letter to the principal of the third grade school describing incidents that had occurred over the past school year was hand delivered to the principal on June 16, 2005, the last day of school at the end of the school day. (Tr. Vol. I, p. 76) As such, there was no means by which the third grade school could address any of the issues raised as Joshua would be attending a new school for the fourth grade.

33. At the end of the third grade, the District determined that Joshua would be passed to the fourth grade and the Plaintiffs and the special education teacher agreed with this assessment. (Tr. Vol. I, p. 64; Vol. III, p. 31-32)

34. By the end of the third grade Joshua had experienced significant progress: his writing skills improved (Tr. Vol. I, 86); he was doing well academically and was doing his homework quickly so that he could work on other work and social skills during the half hour homework period with the special education teacher (Tr. Vol. II, p. 201); he was doing well socially within his classroom and had a very warm support system of classmates in the regular classroom (Tr. Vol. II. 201-202); he was maintaining his emotional composure within the classroom and during the school day (Tr. Vol. II, p. 202); and his cognitive growth was significant. (Tr. Vol. II, p. 233)

35. At the end of the third grade, the third grade special education teacher did not observe any red flags indicating that there would be a problem with Joshua progressing to the fourth grade. (Tr. Vol. II, p. 234)

36. The characteristics of Joshua's Asperger's syndrome caused him to have a negative perception of his environment and his classmates. (Tr. Vol. III, p. 83; Vol. IV, p. 40)

37. At the end of the third grade, John was very successful in the regular education classroom. (Tr. Vol. II, p. 234)

38. Dr. Patricia Meinhold, a clinical psychologist accepted as an expert in the area of Asperger's and treatment of children with Asperger's, testified that the January 2005 IEP as written for the third grade provided Joshua with a free and appropriate public education. (Tr. Vol. V, p. 57-61, 89-90)

39. Dr. Patricia Meinhold testified that the January 2005 as implemented provided Joshua with a free and appropriate public education. (Tr. Vol. V, p. 89-90)

40. In February or March of 2005, the staff from the fourth grade school met with the staff from the third grade school, including the special education teacher, to discuss all of the students with IEPs that would be transitioning to the fourth grade, including Joshua. (Tr. Vol. II, p. 205; Vol. III, p. 45-47; Vol. IV, p. 211-212)

41. In May 2005, staff from the fourth grade met with the special education teacher, observed Joshua and discussed his programming with the special education teacher in further efforts to ensure an effective transition to the fourth grade. (Tr. Vol. II, p. 205; Vol. IV, p. 214-216)

42. An IEP team meeting was held at the fourth grade school on September 2, 2005 from 2:15 through 5:15 p.m. at which the parents and their counsel were present and participated. (Exhibit AB-2)

43. On the basis of discussions during the course of the IEP meeting, as well as records reviewed from the third grade school, independent evaluations contained in Joshua's records and staff meetings with third grade school personnel, the fourth grade school IEP Team recommended certain modifications and accommodations to support the student as set forth on

the Supplementary Aid and Services to Support Student page of the IEP and recommended that Joshua receive the services as listed on the Special Education and Related Services page. (Tr. Vol. IV, p. 221-223; Exhibit AB-2)

44. The fourth grade IEP made modifications to the January IEP in order that Joshua's transition to the new fourth grade school in the District would be assisted by additional supportive services and modifications. (Tr. Vol. IV, p. 223-224, 227-228)

45. The fourth grade IEP contained assurances that the IEP would be fully implemented by expressly providing for regular IEP team meetings, the first to take place within four weeks of school. (Tr. Vol. IV, p. 229-230) Additional modifications included a paraprofessional that would be available in John's regular classroom to help him with his organizational and structural issues as well as the other objectives listed in his IEP. (Tr. Vol. IV, p. 225) At the request of the parents, the IEP team separated out direct and consulting services for each provider. (Tr. Vol. IV, p. 141-142)

46. The IEP also provided that Joshua would have a paraprofessional to supervise him during non structured activities, such as lunch and recess, and transitional periods. (Tr. Vol. IV, p. 223-224; Exhibit AB-2; Affidavit of Joan Sousa.) At no point during the IEP meeting did Mr. Joshua or Mrs. Jane Doe request that John be provided a dedicated one-on-one paraprofessional for the entire school day. (Tr. Vol. V, p. 168; Affidavit of Joan Sousa)

47. During the IEP meeting, Plaintiffs emphasized the need that Joshua not be singled out from other classmates. (Tr. Vol. IV, p. 224)

48. The special education staff at the fourth grade school participates in ongoing training regarding Asperger's and autism. (Tr. Vol. IV, p. 230; Vol. V, p. 15-16)

49. Dr Patricia Meinhold testified that the September 2005 IEP for the fourth grade year provided Joshua with a free and appropriate public education. (Tr. Vol. V, p. 100-101)

50. Plaintiffs began considering placement of Joshua at the Wolf School around March 2005. (Tr. Vol. I, p. 42-43; Vol. II, p. 51-52, 55; Tr. Vol. II, p. 124, 210) Plaintiffs proceeded through the Wolf School's admissions process in Spring 2005, while Joshua was attending third grade in the District. (Tr. Vol. II, p. 125-126)

51. Plaintiffs sent a deposit to the Wolf School in June 2005. (Tr. Vol. I, p. 79) Joshua was enrolled in the Wolf School as of August 2005. (Tr. Vol. II, p. 63-64)

52. Petitioners' decision to enroll John at the Wolf School was made prior to the September 2, 2005 IEP meeting. (Tr. Vol. III, 49; Vol. IV, p. 115; Exhibit A-15)

53. The Wolf School did not provide Joshua with an IEP. (Exhibit A-13)

54. Joshua attended a three week summer program at the Wolf School during the summer after third grade which was less successful than the summer before, as he reported disliking the teacher of the program. (Tr. Vol. II, 57-58)

55. The classes at the Wolf School consist entirely of children with special learning needs. (Tr. Vol. I, p. 83-84; Vol. IV, p. 88)

56. Joshua continued to be treated with Prozac after he left the District's school system and has continued treatment while attending the Wolf School. (Tr. Vol. II, p. 60, 64)

57. Joshua continued to experience anxiety after he left the District's school system and began attending the Wolf School. (Tr. Vol. II, p. 76, 78)

58. The District was ready, willing and able to implement the fourth grade IEP for Joshua Beitle with the modifications recommended by the Hearing Officer.

59. The District remains ready, willing and able to implement the an appropriate IEP for Joshua Beitle incorporating the modifications recommended by the Hearing Officer.

EAST GREENWICH SCHOOL COMMITTEE,
By their Attorneys,

Raymond A. Marcaccio, Esquire (#3569)
Christine M. Curley, Esquire (#4529)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
(401) 861-2922 Fax

**CERTIFICATION**

I hereby certify that a true copy of the foregoing Defendant's Statement of Facts was sent regular mail to Mary Ann Carroll, The Law Offices of Stephen M. Robinson, 155 South Main Street, Suite 402 Providence, RI 02903 on the 14th day of July, 2006.