UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID BEITLE and JULIE BEITLE, :
as parents and next friends of JOSHUA BEITLE :
: C.A. No. 06-62 ML
v. :
:
EAST GREENWICH SCHOOL COMMITTEE :

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter came before this Honorable Court on appeal of the Special Education Due Process Hearing Officer's decision of January 13, 2006. As is typical procedure for such appeals, the Plaintiffs filed a Motion for Summary Judgment, along with a Statement of Facts. The Defendant has filed its own Cross-Motion for Summary Judgment and Statement of Facts, as well as a Response to Plaintiffs' Statement of Facts. In support of their Objection, Plaintiffs rely upon their own Memorandum in support of their Motion for Summary Judgment. In addition, Plaintiffs file this Reply Memorandum in order to address several points raised in the Defendant's Memorandum in support of their Motion for Summary Judgment. Plaintiffs in a separate document also respond to the Defendant's Statement of Facts.

## II. LEGAL ARGUMENT

### A. THE PLAINTIFFS WERE IN NO WAY "RESPONSIBLE" FOR THE SHORTFALLS IN JOSHUA'S EDUCATIONAL PROGRAMMING.

The Defendant's Memorandum repeatedly attempts to suggest that its neglect of Joshua's educational needs are somehow excusable because the Plaintiffs allegedly failed to bring key information to the District's attention, or that it was somehow unclear that Joshua suffered from a disability. The Defendants also suggest that the Plaintiffs did not participate in the IEP process

in good faith because they had already decided to send Joshua to Wolf. Those allegations are simply not supported by the extensive record compiled on this point.

In the first place, as we discussed to some extent in our earlier Memorandum, Dr. and Mrs. Beitel had consistently shared information with the District regarding Joshua over the years, and fully participated in the process of making appropriate arrangements for their son's education. It was the District that ignored that evidence, and otherwise failed to follow through. We expand upon the evidence discussed in our earlier Memorandum here. As Mrs. Beitel's uncontradicted testimony detailed, Joshua's difficulties in fact dated back to his first days in kindergarten, when he had difficulty completing his classwork and his homework. (Tr. 10/31/05, p. 12.) By the first grade, it was clear that he was having trouble acquiring reading skills. (Tr. 10/31/05, p. 14.) It was reported by his teachers that the problem was neither Joshua's attitude or intelligence. (Tr. 10/31/05, p. 12-14.) During kindergarten and first grade, Mrs. Beitel attempted to discuss Joshua's issues with his teachers. She was merely told that Joshua "would be fine" or eventually "work it out." (Tr. 10/31/05, p. 12-16.) By the second grade, Joshua's difficulties with school work had gotten even worse. His teacher would report clear signs of language and social difficulties, and often misunderstood what was said to him. (Tr. 10/31/05, p. 17-21.)

Although the District did provide some services from a reading specialist, it was largely left for Dr. and Mrs. Beitel to fill in the gaps. Joshua's mother worked with him extensively over the summer between Joshua's kindergarten and first grade year. (Tr. 10/31/05, p. 13.) During the summer between this first grade and second grade year, Joshua's parents provided him with tutoring – from a District teacher. (Tr. 10/31/05, p. 16-17.) Despite the fact that by this time, numerous school personnel were on notice of a potential disability, they were apparently not well-motivated to evaluate the child. In fact, Joshua's parents specifically asked his second grade

teacher whether Joshua should receive an evaluation from the schools. The teacher indicated that because Dr. and Mrs. Beitel had already indicated that they were having some evaluations done, the District would simply wait for their results. (Tr. 10/31/05, p. 19.)

Joshua's parents continued to assist their son through their own efforts. By this time, the District's neglect had taken its toll. Beginning in kindergarten, he started to have nightmares, and suffered poor self-esteem. (Tr. 10/31/05, p. 13, 20-21; Exhibit A-3.) One of the evaluators retained by Dr. and Mrs. Beitle indicated that Joshua already suffered Anxiety Disorder as a result of his school problems. (Exhibit A-3.) Joshua's parents retained a psychotherapist. (Tr. 10/31/05, p. 22, 27.) During the summer between Joshua's second and third grade, Dr. and Mrs. Beitle provided speech therapy and tutoring. (Tr. 10/31/05, p. 28.) They also paid to send him to the summer program at Wolf School, in order to permit him the opportunity to work on his social skills, sensory processing, and social communication. (Tr. 10/31/05, p. 22; 11/3/05, p. 122.) They also informed the District of the Wolf School's reports regarding Joshua's participation in that program. (Tr. 10/31/05, p. 22.) These evaluations signaled serious disability, and also an anxiety disorder that was the result of his school difficulties. (Exhibits A-1, A-2, and A-3.) However, the District itself would not evaluate Joshua until the fall of his third grade year. Even then, the District denied Joshua special education service. (Tr. 10/31/05, p. 31.)

Joshua's parents then obtained the evaluation of Dr. Hopkins, who diagnosed Asperger's Disorder. (Exhibit A-7.) Joshua's parents also shared that evaluation with the District. (Tr. 10/31/05, p. 36.) Dr. Hopkins herself performs outside evaluations for the District. (Tr. 11/3/05, p. 199.) It was only then that the District found Joshua eligible for special education. (Tr. 10/31/05, p. 36.) At that point, the District's own reading specialist revealed the extent to which Joshua's needs had been ignored – and also the extent to which the District itself was not sharing

information. The reading specialist indicated that the District had been "throwing" Joshua's diagnosis around for years. When Mrs. Beitel asked why she had never been told that, the reading specialist indicated that they had been forbidden to do so. (Tr. 10/31/05, p. 36.)

By this time, the District had obviously failed its duty to investigate for some time, despite clearly having been put on notice that Joshua was suffering from a disability. Not every disabled child has the good fortune to have parents that are capable of marshalling sufficient resources and discovering the true nature of their child's difficulties. The drafters of the IDEA clearly understood this, and therefore imposed a "child find" requirement on the schools. SPED Regs § 300.125. *See also* Lamoine Sch. Comm. v. Ms. Z., 353 F.Supp.2d at 35, *citing* M.C. ex rel. J.C. v. Central Reg. Sch. Dist., 81 F.3d 389, 397 ("[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . ."). The District had clearly failed to fulfill this mandate, largely ignoring Joshua's problems until presented with clear evidence of its own neglect in the form of a diagnosis prepared by a consultant that the District itself utilized. (Exhibit A-7; Tr. 11/3/05, p. 199; Tr. 12/1/05, p. 36.)

Also contrary to the District's suggestions, Dr. and Mrs. Beitel consistently communicated with the District during Joshua's third grade year regarding Joshua's emotional problems, and attempted to work with District officials regarding appropriate education for Joshua. Dr. and Mrs. Beitel testified that they had communicated with Ms. Grey and John's classroom teacher regarding the numerous failures to implement Joshua's IEP. (Tr. 10/31/05, p, 39, 42-43, 58.) Similarly, Dr. Hopkins attempted to discuss these issues with Ms. Grey. (Tr. 12/1/05, p. 47.) Ms. Grey corroborated Mrs. Beitel's testimony as to the numerous times that

these failures had occurred, and that Mrs. Beitel had brought these issues to her attention. (Tr. 11/3/05, p. 111-12, 175-80, 182-85, 187-89, 198; Tr. 11/15/05, p. 66.)

Furthermore, Dr. and Mrs. Beitel testified that they had in fact told Ms. Grey of the serious emotional problems that Joshua was experiencing. Dr. and Mrs. Beitel specifically informed her of the fact that by this time Joshua required pharmacologic treatment to deal with these issues. (Tr. 10/31/05, p. 39; Tr. 12/2/05, p. 139.) Ms. Grey similarly corroborated this testimony. (Tr. 11/15/05, p. 43, 76.) While the District makes much of the fact that no records were provided, it is certainly significant that there is no evidence that the District asked for them.

Unfortunately, not even the plain evidence of emotional harm to Joshua caused District officials to be more responsive. On the recommendation of Ms. Grey, Joshua's parents wrote and hand-delivered a letter to the principal, Assistant Superintendent, and Ms. Grey regarding the failure to implement Joshua's IEP. This letter was never responded to. (Tr. 10/31/05, p. 44-45; Exhibit A-8.) Even worse, the District clearly intended to continue its neglect into the next school year, despite the Beitel's attempts to engage the District in the process of formulating an appropriate IEP. The next school year was of particular concern, because Joshua would be moving to a different school. However, as late as the May, 2005 IEP meeting, the District was unable to provide Joshua's parents with so much as a name of the contact person at the new school. (Tr. 12/2/05, p. 140.) Dr. Beitel sent a letter requesting another IEP meeting on or about August 5, 2005. (Tr. 12/2/05, p. 146.) However, as the Special Education Director herself admitted, it would be two weeks before that letter was even acted upon. (Tr. 12/2/05, p. 170.) No meeting at all was scheduled until September 2, 2005 – when the school year was well underway. (Tr. 12/1/05, p. 220; Tr. 12/2/05, p. 156.) That meeting, as we discussed in our Memorandum, did not provide Joshua with adequate services.

The District devoted a great deal of time during this process attempting to show that the decision to transfer Joshua to Wolf had been made before the September 2, 2005 IEP meeting. Apparently, the District would have it believed that there was a "hidden agenda" to gain tuition reimbursement. This conclusion is not supported by the evidence. It was never a secret that the Beitels were at least considering Wolf. Both Mrs. Beitel and Ms. Grey indicated that Mrs. Beitel had raised the possibility of Joshua's going to Wolf before. (Tr. 10/31/05, p. 42-43; Tr. 11/3/05, p. 200.) It is true that they made a tuition deposit before the September 2, 2005 IEP meeting, but that was necessary to keep their options open. (Tr. 11/3/05, p. 155.) It is also true that they had not sent Joshua to school in the District by September 2, 2005. However, that was because the Beitels felt that it would be entirely too stressful to have Joshua begin at one school only to transfer to another. (Tr. 12/2/05, p. 156.) It was only after the abortive September 2, 2005 IEP meeting that the Wolf decision became final.

In any case, the District's apparent argument regarding the precise timing of the Beitel's final decision is a red herring. Given the many years of neglect, it is hardly a sign of unreasonableness or bad faith for the Does to have considered other options for Joshua's education. Furthermore, the District did not even offer a meeting to discuss the new IEP until the school year had already begun. Under those circumstances, Dr. and Mrs. Beitel would arguably have been justified in placing Joshua at Wolf without even bothering to go to the IEP meeting and make one final attempt to resolve their issues. There was no evidence that their participation in this meeting was in any way deficient. The principal even admitted that Dr. and Mrs. Beitel raised various concerns. (Tr. 12/2/05, p. 41.) Even if Dr. and Mrs. Beitel were strongly slanted in favor of Wolf at this point, their attendance and participation at the September 2, 2005 IEP meeting should be interpreted as a sign of good faith

The District also tries to suggest that Dr. and Mrs. Beitel were less than candid about the importance of a one-on-one aide, given that Wolf does not provide one. Contrary to the District's suggestion, Dr. and Mrs. Beitel specifically requested that one-on-one aide. (Tr. 12/2/05, p. 149; Affidavit.) In any case, given the Wolf School's "immersion model" and small staffing size, it is obvious that the lack of a one-on-one aide would no longer be a serious issue at Wolf.

Dr. and Mrs. Beitel, then, cannot be said to have behaved improperly. To even suggest otherwise is to sadly malign them for being conscientious and diligent parents. The evidence on the record demonstrates that Dr. and Mrs. Beitel have acted with a great deal of patience and restraint in the face of the District's failure to fulfill its educational responsibilities to their son. They consistently communicated their concerns with the District, and gave the District every opportunity to remediate the situation. By the time that Dr. and Mrs. Beitel finally decided upon unilateral placement, the District had had four years' worth of chances to make good on its responsibilities. For most of the time, the District denied Joshua special education services despite the fact that something was plainly amiss. As we described in our earlier Memorandum, even when the District broke down and offered special educational services, they were provided inconsistently. Still, Dr and Mrs. Beitel preserved in their attempts to work with the District right up to the day of the final IEP meeting. By that time, it was clear that the District's neglect had already had a seriously detrimental effect on their son's psychological well-being. By the end of the meeting, it was also plain that the District had no intention of getting sufficiently organized enough to implement an IEP to any acceptable degree. Under the circumstances, it is unconscionable to claim that Dr. and Mrs. Beitel in any way acted in bad faith towards the District.

**B. DEFENDANT MINIMIZE THE SHORTCOMINGS OF JOSHUA'S EDUCATIONAL PROGRAMMING AND THEIR IMPACT UPON JOSHUA' EMOTIONAL STATE.**

As we discussed in our earlier Memorandum, the hearing officer erred in that she appears to have based her conclusion that Joshua had received a FAPE almost entirely upon the fact that he has been promoted from grade to grade and received passing marks. (Decision, p. 21.) However, the evidence strongly points towards the conclusion that Joshua's well-being was threatened by the District's years of failure to address his needs. Furthermore, the hearing officer failed to give this evidence appropriate consideration when determining whether the District had offered FAPE, and/or was in the position to implement an appropriate IEP.

The District's Memorandum attempts to discount the evidence of Joshua's emotional deterioration by the end of his third-grade year as a result of years of neglect, and attempts to ascribe it to other causes. This position ignores the large amounts of evidence supporting the proposition that Joshua's emotional problems had become acute by the end of the school year, and that they were firmly tied to school. Ms. Grey herself admitted that by the end of Joshua's third grade year, his emotional state had significantly deteriorated. (Tr. 11/3/05, p. 114.) Furthermore, contrary to the suggestions of the District to the contrary, Joshua's emotional difficulties were firmly tied to school. By the end of the third grade year, Joshua often had to go home from school early for stomachaches and headaches. (Tr. 10/31/05, p. 41.) On a number of occasions, Ms. Grey even agreed that he should go home because he was simply unable to learn. (Tr. 10/31/05, p. 42.) When Joshua visited Dr. Hopkins, Joshua talked about school a great deal, and demonstrated serious confusion and anxiety as a result. (Tr. 12/1/05, p. 41-43.) Similarly, when Joshua visited Dr. Pearis, he primarily discussed his school issues. (Tr. 11/3/05, p. 11-12,

22, 34.) Obviously, then, from Joshua's perspective, it was school that was his major difficulty, not other situations. The District only offers rank speculation otherwise.

The District also attempts to place a great deal of stock in the fact that Joshua is not completely free of any psychological disturbances since leaving the District. In particular, they point to the fact that Joshua was still suffering from some anxiety, and is still taking medications. This argument fails. In the first place, it is unrealistic to suppose that Joshua's emotional problems would completely disappear overnight after years in a punishing and overwhelming situation, even in a better school environment. Furthermore, as Dr. Pearis testified, it is common practice to continue anti-depressants for some period of time. (Tr. 11/3/05, p. 78.) In any case, there was overwhelming evidence from Dr. Pears and Dr. Hopkins that they had personally observed significant improvements. (Tr. 11/3/05, p. 22.)

The District also argues that the testimony of Dr. Hopkins and Dr. Pearis ought to be discounted because of the fact that they did not directly observe Joshua in the East Greenwich classrooms. However, that does not negate the fact that both were highly qualified in the educational problems of children suffering from autistic disorders, particularly in the area of how they are able to navigate the public school environment. Furthermore, both spent hours speaking to Joshua himself. On the other hand, Dr. Meinhold – whom the Hearing Officer relied upon – never met Joshua.

The Hearing Officer's decision took into account none of the evidence regarding Joshua's serious emotional problems, and their relationship to school. Instead, she focused almost entirely on the fact that Joshua had progressed from grade to grade. Although her decision touches on Joshua's emotional problems briefly when summarizing testimony, that is

not enough; that evidence had to be actually considered. Joshua's emotional state was highly relevant to the determination of whether the District could offer Joshua a FAPE. Simply put, his emotional problems were evidence that his third grade IEP had not been appropriate. It naturally follows that his fourth grade IEP – which offered him even fewer supports – would have set him up to fail once more, and brought him to the near-crisis stage that he had been edging towards the previous spring. For that reason, the hearing officer committed serious error when she overlooked the evidence regarding Joshua's emotional condition.

## III. CONCLUSION

Based upon the foregoing, the Defendant's Motion for Summary Judgment should be DENIED, and the Plaintiffs' Motion for Summary Judgment should be GRANTED.

David Beitle and Julie Beitle,
By their attorney,

Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
July 28, 2006

**CERTIFICATION**

I, the undersigned, hereby certify that on July 28, 2006 I sent a true copy of the within by regular mail to Raymond Marcaccio, Oliverio & Marcaccio, 55 Dorrance Street, Suite 400, Providence, RI 02903.