UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID and JULIE BEITLE, as Parents of JOSHUA BEITLE | : | |
| v. | : | C.A. No. 06-62ML |
| EAST GREENWICH SCHOOL COMMITTEE | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Before this Court are Cross-Motions for Summary Judgment (Document Nos. 5 and 9) pursuant to Fed. R. Civ. P. 56. The parties are the East Greenwich School Committee ("East Greenwich") and David and Julie Beitle, as parents of Joshua Beitle (collectively the "Beitles"). This matter was referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. A hearing was held on September 8, 2006. After reviewing the Administrative Record and Memoranda submitted, listening to the arguments of counsel and conducting independent research, I recommend that East Greenwich's Motion for Summary Judgment be GRANTED and the Beitles' Motion for Summary Judgment be DENIED.

**Statement of Facts**

This case involves an appeal by the Beitles from a Hearing Officer's decision following an impartial due process hearing conducted pursuant to 20 U.S.C. § 1415, the Individuals with Disabilities Education Act ("IDEA"). Section 1415(i)(2)(A) of IDEA provides that any party

aggrieved by a decision made at the conclusion of an IDEA administrative hearing may bring a civil action in this Court seeking review of the decision.

David and Julie Beitle are the parents of Joshua Beitle ("Joshua") who has been diagnosed with Asperger's Syndrome. Joshua entered the East Greenwich Public Schools (the "District") as a kindergartner in September 2001. Joshua advanced through first and second grade in the District. At the end of Joshua's second-grade year (June 2004), the District held a special education eligibility evaluation meeting. The District determined that further testing was necessary to evaluate Joshua's eligibility under the IDEA. Joshua's parents enrolled him in a summer camp for three weeks at the Wolf School[1] between his second and third grade.

In September 2004, the District conducted reading and educational evaluations of Joshua. On October 26, 2004, the District received a copy of a letter addressed to Joshua's parents from treating psychologist, Dr. Shari Wasserstein Elice. Dr. Wasserstein Elice recommended Joshua's parents seek "an evaluation for Joshua for Asperger's Syndrome by a specialist in the Pervasive Developmental Disability field." Ex. A-4. Joshua underwent further evaluation in October and November 2004. On December 21, 2004, the District received a copy of a detailed Diagnostic Evaluation prepared by Dr. Jessica L. Hopkins of the Neuro Development Center. Ex. A-7. Dr. Hopkins concluded that "Joshua's behavioral history and his present profile of strengths and deficits are consistent with a diagnosis of Asperger's Disorder." Id., p. 6. Although Joshua's parents assert

[1] The Wolf School is a small, private school located in East Providence that serves children with various learning difficulties. Although it is a State-accredited school, it is not certified as a special education facility. Decision, p. 7, n.4.

their belief that he had suffered from Asperger's Syndrome for some time, it is undisputed that Dr. Hopkins' evaluation was Joshua's first diagnosis of Asperger's Syndrome.[2]

Based on this diagnosis, the District determined that Joshua was eligible for special education services under IDEA. The District convened an Individualized Education Plan ("IEP") team meeting and developed an IEP with effective dates from January 7, 2005 through January 7, 2006. Joshua's parents accepted and signed the IEP. Joshua's parents agreed in January 2005 that a self-contained environment was not an appropriate placement for Joshua. The District assigned a special education teacher, Ms. Lore Gray, to work with Joshua in the third grade. Ms. Gray has extensive experience working with children in the autism spectrum; she co-founded the Rhode Island Autism Project and is regarded as an expert in the field of special education of autistic children. Ms. Gray discussed Joshua's January 2005 IEP with Dr. Hopkins. Both Dr. Hopkins and Ms. Gray assessed Joshua's autism as high functioning. Joshua's mother communicated with Ms. Gray at least three times a week after the IEP was put in place. Ms. Gray modified Joshua's IEP during the course of his third grade to provide additional supports.

In May 2005, an IEP status meeting was held with Joshua's parents and the third grade IEP team. Ms. Gray testified that, in her opinion, extended school year, <u>i.e.</u>, summer, services were not necessary, and, in any event, Joshua did not meet the State eligibility standards for them. On June 16, 2005 (the last day of school), Joshua's mother presented a letter to the school Principal describing incidents that had occurred with Joshua during his third-grade year and expressing

---

[2] Asperger's Syndrome is generally defined as a Pervasive Developmental Disorder characterized by severe impairment in social interaction by individuals with average to superior intelligence. Decision, p. 5, n.3.

concern. Ex. A-8. The District decided that Joshua would be advanced to fourth grade with the concurrence of Joshua's parents and Ms. Gray.

Joshua's parents provided him with supports over the Summer of 2005. Joshua again went to a three-week camp at the Wolf School and participated in a weekly social group for seven weeks with the Rhode Island Autism Project. Joshua's father requested an IEP meeting in August 2005, and one was convened by the District on September 2, 2005. In addition to transitioning to a new grade, Joshua was also transitioning to a new building, the George R. Hanaford School, as his prior school building (the Meadowbrook Farms School) only went up to the third grade. Joshua's IEP was modified for fourth grade. Ex. AB-2. At the meeting, Joshua's parents expressed reservations about the fourth-grade IEP saying: "This team does not understand our concerns regarding last year." Id., p. 13. The IEP team disagreed. Id.

Joshua did not attend fourth grade at the Hanaford School. Joshua's parents rejected the fourth-grade IEP and enrolled Joshua at the Wolf School for fourth grade. Although Joshua's parent deny making a final decision to enroll him at the Wolf School prior to the September 2, 2005 IEP meeting, it is undisputed that they actively explored the option during Joshua's third-grade year, and they made a deposit to the Wolf School some time in June 2005. Hearing Transcript ("Tr.") Vol. I, p. 79; Decision, p. 7.

On September 22, 2005, the Beitles requested an impartial due process hearing regarding the implementation of Joshua's IEP. Five hearing days were held between October and December 2005. The Hearing Officer issued her decision on January 13, 2006, finding that East Greenwich was not

"financially responsible" for Joshua's parental placement at the Wolf School in the Summer of 2005 and the 2005-2006 school year.

The Beitles have appealed the Hearing Officer's decision. The Beitles dispute her finding that the fourth-grade IEP proposed by East Greenwich provide a free appropriate public education ("FAPE") to Joshua. For the reasons discussed below, this Court concludes that the Hearing Officer's determination is legally correct, supported by the record and should be AFFIRMED.

**Standard of Review**

A district court, when reviewing an administrative decision under IDEA, is required to give "due deference" to a hearing officer's findings of fact. Abrahamson v. Hershman, 701 F.2d 223, 231 (1st Cir. 1983). However, a district court reviews a hearing officer's rulings of law under the IDEA framework *de novo*. See Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111-12 (D. Mass. 1999), aff'd 229 F.3d 1133 (1st Cir. 2000). Therefore, this Court should disregard any rulings not in accordance with applicable statutes and precedents. See id. (citing Abrahamson, 701 F.2d at 231). Finally, when the issue implicates a school district's educational expertise, the courts must give "due weight" to the administrative findings because "[j]urists are not trained, practicing educators." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990).

When the parties choose not to submit additional evidence to the court, as in this case, there is no new factual material to be considered. Thus, the parties may ask the judge to decide the case on the basis of the administrative record by way of cross-motions for summary judgment. Hunger v. Leininger, 15 F.3d 664, 669 (7th Cir. 1994). This is not to be confused with the typical pre-trial summary judgment procedure in which the court must consider the facts in the light most favorable

to the non-moving party. Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997). Rather, under the IDEA, "[t]he party challenging the outcome of the...administrative decision bears the burden of proof." Id.

## Analysis

### A. The Hearing Officer's Decision as to FAPE is Supported by the Record

The Hearing Officer correctly held that the Beitles, as the party seeking relief, bore the burden of proving that the educational program offered by the District (i.e., the fourth-grade IEP) would not have provided FAPE to Joshua. Decision, p. 14; see also Schaffer v. Weast, 126 S. Ct. 528, 537 (U.S. 2005) (Under IDEA, the burden of proof in an administrative hearing challenging an IEP is "properly placed upon the party seeking relief."). The Hearing Officer concluded that the Beitles had not met that burden in this case and thus East Greenwich was not "financially responsible" for Joshua's Wolf School expenses.

When parents unilaterally place their child in a private school, as Joshua's parents did here, they are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993). While Joshua's parents had every right to enroll him at the Wolf School while they challenged East Greenwich's IEP, they acted at their own "financial risk" in doing so. Michael C. v. Radnor Township Sch. Dist., 202 F.3d 642, 651 (3rd Cir. 2000); see also RIDOE Regulation, § 300.403. IDEA contains a "stay-put" provision which requires a child to remain in his or her "then current educational placement" pending the outcome of an IDEA proceeding. 20 U.S.C. § 1415(j). If Congress had intended that the parents' requested

placement be provided during a dispute, it could have provided for such in IDEA. Schaffer, 126 S. Ct. at 536. It did not. Id.

Given the underlying burden of proof and applicable standards of administrative review, the Beitles face a difficult task in this appeal. The Beitles must convince this Court, giving "due weight" to the Hearing Officer's decision and "due deference" to her findings of fact, that the Hearing Officer erred in determining that they failed to meet their administrative burden of proof on the issue of FAPE.[3]

The Beitles initially argue that the Hearing Officer erred by basing her FAPE determination "almost entirely" on the fact that Joshua was promoted from grade to grade and received passing academic grades. Pls.' Mem. at p. 4. They argue that it is a denial of FAPE to focus "solely on a child's academic progress, and ignore his emotional and social issues." See Bd. of Educ. v. Rowley, 458 U.S. 176, 203 n.25 (1982) (although relevant, grade advancement not dispositive of FAPE issue). This argument fails. It is apparent from the Hearing Officer's decision that she did not base her FAPE determination "almost entirely" on Joshua's grade advancement. Although the Hearing Officer noted Joshua's grade promotion, it was only one factor considered in an extensive record. At page 21 of her decision, the Hearing Officer discussed Joshua's grade promotion in the context of mainstreaming. She noted that IDEA, 20 U.S.C. § 1412(5), "commands" the school district to construct an educational program in "the least restrictive educational environment appropriate to the child." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 534 (3rd Cir. 1995); see also RIDOE

[3] The Beitles also contend that the Wolf School is an appropriate placement for Joshua. Because she found that East Greenwich offered FAPE to Joshua, the Hearing Officer did not specifically address this argument. This Court's recommendation that the Hearing Officer's FAPE determination be affirmed also makes it unnecessary to reach the Wolf School issue.

Regulation § 300.550(a)(1) (districts "shall ensure" that, "to the maximum extent appropriate, children with disabilities...are educated with children who are nondisabled").

In addition, the Hearing Officer described the issue of the appropriateness of Joshua's third-grade IEP as "fact intensive" and found that:

> The third-grade special education teacher[, Ms. Gray,] provided careful attention to [Joshua], he progressed academically and made emotional adjustments at school. There were problems that came up from time to time, but they were handled promptly and teaching strategies were changed when necessary. The pediatric psychologist employed by [East Greenwich] to review all of [Joshua's] records and to interview his third grade service providers concurred....

Decision, p. 21. In addition, the Hearing Officer appropriately weighed the competing expert evidence and concluded:

> As the psychiatrist observed, there are various opinions concerning Asperger's Syndrome and the treatment thereof. Some experts believe that such children should be mainstreamed in classrooms with non-disabled peers so that they may benefit from the examples set by these students. Like other children, children with Asperger's Syndrome must often deal in a world outside the classroom. While providing appropriate supports, a [public school] can provide a FAPE for these children.

Id., p. 20. These excerpts, and others, make clear that the Hearing Officer did not rely "almost entirely" on Joshua's grade promotion as argued by the Beitles.

The Beitles do not allege any procedural violations. The bulk of their argument focuses on the Hearing Officer's interpretation of the evidence. For instance, they argue that the Hearing Officer "failed to appreciate" certain evidence, "overlooked crucial facts," "ignored" certain testimony and misconstrued the testimony of the parties' respective experts, Dr. Pearis and Dr. Meinhold. A review of the administrative record and the parties' memoranda reveals that the

Hearing Officer was faced with conflicting evidence on many points. This Court is, as noted above, required to give "due deference" to the Hearing Officer's resolution of those conflicts and findings of fact. Thus, the issue is not whether this Court would have made the same determinations as the Hearing Officer but rather whether they are reasonably supported by the record and, if so, whether the Hearing Officer properly applied the law regarding FAPE to those findings.

The Supreme Court and First Circuit have consistently construed the FAPE requirement to mean that any given placement must provide "a reasonable probability of educational benefits with sufficient supportive services at public expense." G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991) (citing Rowley, 458 U.S. at 187-89). "Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity.'" Carlisle Area, 62 F.3d at 533-34 (quoting Rowley, 458 U.S. at 201). The test under IDEA is not whether the IEP would "achieve perfect academic results" or whether it is better or worse than a proposed alternative. Roland M., 910 F.2d at 992-93. Rather, the test is whether the IEP is "reasonably calculated to provide an 'appropriate' education." Id. "[A] FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice." Westmoreland, 930 F.2d at 948. (emphasis in original).

The Hearing Officer plainly understood and relied upon these legal principles in reaching her conclusion on the issue of FAPE. While the Beitles have expressed strong dissatisfaction with Joshua's third-grade experience at the Meadowbrook school, and contend that the Wolf School is the best placement for him, they have not met their burden of establishing that the Hearing Officer

erroneously concluded that East Greenwich's proposed fourth-grade IEP would provide Joshua with FAPE. The Hearing Officer correctly followed and applied the applicable law under IDEA, and also conducted a thorough review of the evidence presented to her over five hearing days. This Court has reviewed the underlying record and finds that the Hearing Officer's factual findings have sufficient evidentiary support and thus are entitled to "due deference."

For instance, the Hearing Officer had to weigh the testimony of four testifying experts. She noted that only two of those experts were familiar with the program offered by East Greenwich. Decision, p. 21. Since the primary issue before the Hearing Officer was whether the fourth-grade IEP proposed by the District offered FAPE to Joshua, it was reasonable for the Hearing Officer to consider the familiarity of the experts with the District's program when weighing their testimony. The Hearing Officer noted that one of the Beitles' experts, Dr. Gillian Pearis, a child psychiatrist, recommended that Joshua not be in a classroom exceeding twelve students but had never observed Joshua's classroom in the public school setting. Decision, p. 18; Tr. Vol. II at pp. 18 and 36. Dr. Pearis conceded that her understanding of Joshua's experience in the District was based solely on information received from Joshua and his parents. Tr. Vol. II at p. 36. She also conceded that it was possible that Joshua's depression would cause him to put things in a more negative light than actually existed. Id. Finally, Dr. Pearis agreed it would have been "helpful" to her assessments if she had actually seen the classroom environment in the District. Id. at p. 37. Similarly, Dr. Jessica Hopkins, a child psychologist, also conceded that, although she had "spent a fair amount of time at the Wolf School observing school staff," she had not spent any time observing the classroom setting

in the District. Tr. Vol. IV at pp. 56-57. It was proper for the Hearing Officer to consider the foundation for the experts' opinions when weighing their testimony.

Much of the evidence and argument in this case focuses on Joshua's third-grade experience. As previously noted, Joshua's first Asperger's diagnosis came in December 2004 and an IEP was implemented effective January 14, 2005 and accepted by the Beitles. Ex. AB-1. That IEP was reviewed by Dr. Hopkins and, at the time, she felt "very hopeful that this could work for [Joshua] particularly given that they had such a good consultant [Ms. Gray] in their program." Tr. Vol. IV at p. 37. Dr. Hopkins changed her opinion, as the school year progressed, based on information received from Joshua and his parents about compliance with the initial IEP. Id. at pp. 37 and 87. As noted by the Hearing Officer, Dr. Hopkins, however, did not observe Joshua's third-grade classroom and only conferred with Joshua's special education teacher on one occasion. Decision, p. 20. Again, it was not error for the Hearing Officer to take these facts into consideration when weighing the expert testimony.

The Hearing Officer simply gave more weight to the evidence presented by East Greenwich. The Hearing Officer noted that Ms. Gray, the third-grade special education teacher, "provided careful attention to [Joshua]" and that the "problems that came up from time to time...were handed promptly and teaching strategies were changed when necessary." Decision, p. 21. Although the Beitles strongly argue that Joshua's initial IEP was not implemented appropriately in third grade,[4] there was conflicting evidence on this point, and the reasonable resolution of such conflicts was

---

[4] In the end of school year letter, the Beitles identified several incidents of concern from Joshua's third-grade experience. Ex. A-8. However, they also stated their belief that the District had a "reasonable plan in place" for Joshua. Id. at p. 1.

within the province of the Hearing Officer. For instance, the Hearing Officer noted Ms. Gray's undisputed expertise in the field of autism and the fact that she visited Joshua's classroom daily and provided one-on-one assistance to him. Id., p. 15. Ms. Gray testified that Joshua was doing well academically at the end of third grade, he was "functioning fine" in the classroom and "okay" outside from a social standpoint and "struggling a little bit" emotionally but he did a "very good job in school keeping it together." Tr. Vol. II at pp. 201-202. Joshua's mother communicated "frequently" with Ms. Gray about her concerns during the school year and agreed that Ms. Gray always responded to them. Tr. Vol. I at p. 62. She also confirmed that Ms. Gray increased the amount of time she spent with Joshua as the school year progressed. Id. at pp. 62-63. The initial IEP did not provide for a self-contained learning environment for Joshua, and both Joshua's parents and Dr. Hopkins agreed with that IEP. Tr. Vol. I at pp. 63-64, Vol. IV at p. 37 and Ex. AB-1. This meant that Joshua was going to be educated in a mainstream environment with other third graders and thus there was, of course, the potential for issues with other students. Ms. Gray testified that each of these issues presented a "teachable moment" for her to assist Joshua in learning how to "cope and to use strategies and skills" in a mainstream population. Tr. Vol. II at pp. 214-215.

The Hearing Officer also relied upon the opinion of the District's expert psychologist, Dr. Patricia Meinhold, who concurred that it was appropriate to educate Joshua in an integrated classroom setting. Tr. Vol. IV at pp. 102-103. Although Dr. Meinhold recognized that such a setting may not be appropriate for all students with Asperger's, she testified as to Joshua that:

> I think in his case because he's so academically sophisticated and close to his peers, he is so intellectually gifted, there's every reason to put those things together and use a regular education setting as a

> place to bring him along and – and let him learn in a more typical setting with the supports that he needs.

Id. at p. 104. Dr. Meinhold indicated that if Joshua continued to have problems in the integrated setting additional supports "could have easily been ramped up before the extreme plan of going to a more restrictive setting away from his neighborhood school should be proposed." Id. at p. 106.

Finally, the Hearing Officer accurately noted that "[t]here was a transition plan in place to notify [East Greenwich's] fourth-grade service providers of [Joshua's] needs." Decision, p. 22. Ms. Joan Souza, the Hanaford School Principal, testified that this "intake process" began in February of the prior school year. Tr. Vol. IV at p. 212. She also testified that a further transitional meeting between school service providers took place in May. Tr. Vol. V at p. 5. The Hearing Officer also appropriately considered that the proposed fourth-grade IEP included some additional supports not contained in the initial IEP including an express addition of "paraprofessional support throughout the day." Decision, p. 22; compare Ex. AB-1 pp. 9-10 with Ex. AB-2 pp. 9-11.

The Beitles were present and attentive at the September 8, 2006 hearing in this matter. A review of the record makes clear that they are concerned and supportive parents who faced a difficult decision in 2005 regarding Joshua's school placement. Although an IEP was in place for Joshua, they were not satisfied, and they faced the uncertainty of his move to a new school building with new teachers, specialists, and administrators. Since Joshua never attended the Hanaford School for fourth grade, no one can state with any level of certainty whether Joshua's transition would have been successful or unsuccessful. The Hearing Officer certainly did not have a crystal ball enabling her to see into the future, and she was forced to weigh competing opinions on the topic. The Beitles had to make a similar "blind" decision and were ultimately of the opinion that the Wolf School was

a better placement for Joshua. While the Beitles may well be correct about the Wolf School, the issue before the Hearing Officer was not whether the Wolf School was better than the District. The issue was whether the District's proposed fourth-grade IEP would have provided Joshua with FAPE. The Beitles have not met their burden of establishing that the Hearing Officer erroneously decided this issue in favor of East Greenwich. Thus, the Hearing Officer's decision as to FAPE must be affirmed.

### B. The Hearing Officer's Decision as to Extended School Year Services is also Supported by the Record

The Beitles also requested reimbursement for the cost of Joshua's attendance at a three-week summer camp in 2005 at the Wolf School. The Hearing Officer denied the request on two grounds that are both supported by the record.

First, the Hearing Officer noted that the Beitles never requested extended school year ("ESY") services. Decision, p. 23. In their Memorandum, the Beitles do not dispute this finding. Pls.' Mem. at p. 19. Rather, they assert that ESY was never offered by East Greenwich and that their unilateral decision to provide Joshua with summer programming and tutoring over the years entitles them to reimbursement. The Beitles offer absolutely no legal authority for this argument. Id.

Second, the Hearing Officer found that there was no evidence that Joshua would have regressed had he not attended summer camp at the Wolf School. Decision, p. 23. Ms. Gray testified that she did not recommend or consider Joshua for ESY because he did not meet the criteria. Tr. Vol. III at p. 31. She explained that ESY was only for students who would regress academically

over the summer and could not catch-up within the first quarter of the school year. Id. The Beitles have shown no error in the Hearing Officer's decision as to ESY.

## Conclusion

For the reasons stated, I recommend that East Greenwich's Motion for Summary Judgment (Document No. 9) be GRANTED and the Beitles' Motion for Summary Judgment (Document No. 5) be DENIED and that the District Court conclude that the Hearing Officer's January 13, 2006 determination is legally correct, supported by the record and should be AFFIRMED.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
October 6, 2006